*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| BENJAMIN N. NAGEAK, | ) | |
| | ) | Supreme Court Nos. S-16462/16492/ |
| Appellant, | ) | 16494 (Consolidated) |
| | ) | |
| v. | ) | Division of Elections Recount Appeal |
| | ) | |
| BYRON MALLOTT, Lieutenant | ) | O P I N I O N |
| Governor of the State of Alaska, and | ) | |
| JOSEPHINE BAHNKE, Director of | ) | |
| the Alaska Division of Elections, | ) | No. 7286 – August 31, 2018 |
| | ) | |
| Appellees, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DEAN WESTLAKE, | ) | |
| | ) | |
| Intervenor. | ) | |
| _____ | ) | |
| | ) | |
| BYRON MALLOTT, Lieutenant | ) | |
| Governor of the State of Alaska, and | ) | Superior Court No. 3AN-16-09015 CI |
| JOSEPHINE BAHNKE, Director of | ) | |
| the Alaska Division of Elections, | ) | |
| | ) | |
| Appellants and | ) | |
| Cross-Appellees, | ) | |
| | ) | |
| v. | ) | |
| | ) | |

BENJAMIN N. NAGEAK, ROB )
ELKINS, ROBIN D. ELKINS, )
LAURA WELLES, and LUKE )
WELLES, )
)
        Appellees and )
        Cross-Appellants, )
)
    and )
)
DEAN WESTLAKE, )
)
        Intervenor. )
_____ )

        Appeal in File No. S-16462 from the Alaska Division of Elections. Appeal in File Nos. S-16492/16494 from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Guidi, Judge.

        Appearances: Timothy A. McKeever and Stacey C. Stone, Holmes Weddle & Barcott, P.C., Anchorage, for Appellant Nageak and Appellees and Cross-Appellants Nageak, Elkins, Elkins, Welles, and Welles. Laura Fox, Joanne Grace, and Margaret Paton Walsh, Assistant Attorneys General, Anchorage, Elizabeth M. Bakalar, Assistant Attorney General, and Jahna Lindemuth, Attorney General, Juneau, for Appellees and Appellants and Cross-Appellees Mallott and Bahnke. Thomas P. Amodio and Debra J. Fitzgerald, Reeves Amodio, LLC, Anchorage, for Intervenor.

        Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

        STOWERS, Chief Justice.
        WINFREE, Justice, dissenting in part.

## I. INTRODUCTION

A very close Alaska Democratic Party primary election was held in House District 40 in 2016 in which, after a recount, Dean Westlake was declared the victor by eight votes. The defeated candidate, Benjamin Nageak, brought two legal challenges to the primary results. He and four others contested the election in the superior court pursuant to AS 15.20.540. He also filed a direct appeal of the recount in this court pursuant to AS 15.20.510. We stayed the direct appeal and, after a trial, the superior court granted relief on the election contest. The court found that election officials in Shungnak, who gave ballots for both the Alaska Democratic Party and Alaska Republican Party primaries to every voter, had committed malconduct that changed the outcome of the election. The court ordered the Director of the Division of Elections to certify Nageak as the winner after proportionately reducing the votes from Shungnak. The Division and Westlake appeal the superior court's rulings against them. Nageak cross-appeals the court's rulings against him. We consolidated the appeal from the superior court in the election contest with the recount appeal from the Division, and we reversed the superior court's decision and reinstated the Director's certification of Westlake as the winner of the election. We indicated that an opinion would follow. This is our opinion.

## II. FACTS AND PROCEEDINGS

### A. August 16, 2016 Primary Election

These appeals concern the election of Dean Westlake as the Alaska Democratic Party's nominee for state representative from House District 40 in the August 16, 2016 primary election. House District 40 consists of the North Slope Borough, the Northwest Arctic Borough, and part of the Unorganized Borough, an area

larger than most states.[1]  House District 40 had been represented by Benjamin N. Nageak, a Democrat who caucused with the Republicans in the legislature.  He was challenged in the 2016 primary by Dean Westlake, a Democrat supported by people and organizations associated with the Democratic Party.  There were no other candidates running for House District 40 representative in any other party's primary.

The Division of Elections runs all state and federal elections in Alaska.[2]  State law governs primary election contests, but parties choose who may vote in their primary elections.[3]  The Republican Party allows only registered Republican, Undeclared, and Non-Partisan voters to vote in its primary.  The Alaskan Independence, Democratic, and Libertarian parties allow all voters to vote in their primaries.

---

[1]  The total area of House District 40 under the 2011 Redistricting Plan, which contained only the North Slope Borough and the Northwest Arctic Borough, was 135,545.22 square miles.  *See* ALASKA REDISTRICTING BD., AMENDED PROCLAMATION HOUSE DISTRICTS: HOUSE DISTRICT 40 (2011), http://www.elections.alaska.gov/doc/maps/2011-districts/HD40.pdf (district for 2012 elections); U.S. Census Bureau, *Population, Housing Units, Area, and Density: 2010 — United States — County by State; and for Puerto Rico*, AMERICAN FACTFINDER, https://factfinder.census.gov/bkmk/table/1.0/en/DEC/10_SF1/GCTPH1.US05PR (last visited July 11, 2018).  Only four states are larger — Alaska (665,384.04 square miles), Texas (268,596.46 square miles), California (163,694.74 square miles), and Montana (147,039.71 square miles).  U.S. Census Bureau, *supra*.  And the 2013 Redistricting Plan added precincts for the Allakaket, Bettles, and Hughes areas to House District 40, substantially increasing the size of the district.  House District 40 and statewide district maps are attached in the appendix.

[2]  AS 15.10.105(a); AS 15.15.010; *see also* AS 15.30.110-.120; AS 15.30.090.

[3]  AS 15.25.060(b); *see also Cal. Democratic Party v. Jones*, 530 U.S. 567 (2000) (holding that political parties may refuse to participate in primaries in which voters can vote for any candidate regardless of party affiliation); *O'Callaghan v. State, Dir. of Elections*, 6 P.3d 728, 730 (Alaska 2000) (applying this ruling to Alaska).

Consequently, the Division prepares two ballots for primary elections — a Republican ballot and a combined party ballot, known as the Alaskan Independence-Democratic-Libertarian ballot or ADL ballot. Registered Alaskan Independence, Democratic, and Libertarian voters may vote only the ADL ballot, while Republican, Undeclared, and Non-Partisan voters may choose to vote either the ADL or the Republican ballot.

Voters in the House District 40 primary therefore could potentially choose one of two ballots. The two ballots are reproduced below.

**ADL ballot:**

| | |
|---|---|
| **United States Senator** (vote for one) | |
| Blatchford, Edgar | Democrat |
| Metcalfe, Ray | Democrat |
| Stevens, Cean | Libertarian |
| **United States Representative** (vote for one) | |
| Watts, Jon B. | Libertarian |
| Hibler, William D. "Bill" | Democrat |
| Hinz, Lynette "Moreno" | Democrat |
| Lindbeck, Steve | Democrat |
| McDermott, Jim C. | Libertarian |
| **State Senator District T** (vote for one) | |
| Olson, Donald C. "Donny" | Democrat |
| **State Representative District 40** (vote for one) | |
| Westlake, Dean | Democrat |
| Nageak, Benjamin P. "Piniqluk" | Democrat |

**Republican ballot:**

| United States Senator (vote for one) | |
|---|---|
| Murkowski, Lisa | Republican |
| Kendall, Paul | Republican |
| Lamb, Thomas | Republican |
| Lochner, Bob | Republican |
| **United States Representative** (vote for one) | |
| Young, Don | Republican |
| Heikes, Gerald L. | Republican |
| Tingley, Jesse J. "Messy" | Republican |
| Wright, Stephen T. | Republican |

There were no Republican candidates for either House District 40 or Senate District T.

There are multiple ways to cast a ballot. A voter may vote in person by paper ballot at a precinct on election day.[4] A voter may instead choose to vote in-person by touch screen machine. If an election official doubts a voter's qualifications the voter will be required to submit a questioned ballot, which is placed in a separate envelope for later review.[5] A voter who cannot go to the precinct because of a disability may submit a special needs ballot, which a designated representative delivers to the polling place.[6] A voter may cast an absentee ballot by mail by requesting a ballot be sent by mail and then mailing back the ballot in an absentee ballot envelope.[7] A voter may also cast an

---

[4]    AS 15.07.010.

[5]    *Id.*

[6]    AS 15.20.072.

[7]    AS 15.20.081(a)-(e).

absentee ballot in person with an absentee voting official or an election supervisor.[8]

The Director of the Division certified the results of the primary election contest between Westlake and Nageak on September 6, 2016. The Director certified Westlake as the winner of House District 40 with 819 votes to Nageak's 815 votes, a four-vote margin of victory. On September 12, 2016, after conducting a recount requested by Nageak, the Director again certified Westlake as the winner with 825 votes to Nageak's 817, an eight-vote margin of victory.

Nageak and four others filed an election contest complaint in the superior court against the Lieutenant Governor[9] and the Director (collectively the Division) pursuant to AS 15.20.540;[10] Nageak also appealed the recount directly to this court pursuant to AS 15.20.510.[11] Westlake joined both proceedings as an intervenor. We

---

[8]     AS 15.20.061.

[9]     *See* AS 15.10.105(a) ("The lieutenant governor shall control and supervise the division of elections.").

[10]     AS 15.20.540(1) provides that "[a] defeated candidate or 10 qualified voters may contest the nomination or election of any person . . . upon . . . malconduct, fraud, or corruption on the part of an election official sufficient to change the result of the election." The other election challengers that joined Nageak in filing the election contest case in the superior court were qualified voters pursuant to AS 15.20.540.

[11]      AS 15.20.510(2) provides that

> [a] candidate or any person who requested a recount who has reason to believe an error has been made in the recount . . . involving candidates for the legislature or Congress or the office of governor and lieutenant governor may appeal to the supreme court . . . . The inquiry in the appeal shall extend to the questions whether or not the director has properly determined what ballots, parts of ballots, or marks for candidates on ballots are valid, and to which candidate . . . the

(continued...)

stayed the recount appeal until the superior court could rule in the election contest, and we consolidated the recount appeal with the appeal of the superior court ruling.

## B. Nageak's Allegations Of Election Errors

Nageak alleges myriad problems with the election. His main contention is that election officials in Shungnak erred by giving all voters both the ADL and the Republican ballots. Election officials in Shungnak gave all 50 in-person voters and one questioned-ballot voter both ballots, resulting in 102 total ballots being cast from Shungnak across the different primaries. Westlake won the in-person vote in Shungnak with 47 votes to Nageak's 3. The result of the questioned ballot is unknown as it was counted with questioned ballots from other precincts.

Nageak also alleges problems with the two ballot system in Kivalina, where 7 voters insisted on casting both an ADL and a Republican ballot. Local election officials in Kivalina made each voter cast one of these ballots as an in-person ballot and one as a questioned ballot. In the initial vote tally, the Director did not count these 7 questioned ballots, but in the recount the Director counted them. Of these 7 ballots, 5 were Republican ballots and 2 were ADL ballots. Westlake and Nageak each received 1 vote. Westlake won Kivalina with 38 votes to Nageak's 22 votes.

In addition Nageak alleges a problem with special needs ballots in Buckland. A special needs ballot allows a voter who cannot go to the precinct because of a disability to designate a representative to pick up the ballot and bring it to the voter.[12] The voter completes the ballot and signs a voter's certificate with the representative

---

[11](...continued)
vote should be attributed.

[12] AS 15.20.072(a)-(b).

witnessing the voter's signature.[13]  The representative then returns the ballot to an election official.[14]  In Buckland 12 voters used special needs ballots.  Election officials served as both representatives and election officials.  Westlake won Buckland with 43 votes to Nageak's 11 votes.

Nageak alleges many more problems.  Nageak alleges that Ambler election officials did not timely return election materials after the election.[15]  This meant that the Director's initial election results relied solely on the report from the precinct on election night.[16]  Nageak alleges that in Browerville election officials required Republicans seeking to vote the ADL ballot to cast a questioned ballot.  The Director counted these questioned ballots.  Nageak won Browerville with 276 votes to Westlake's 46 votes. Nageak also alleges that at least one convicted felon who was ineligible to vote voted, that voters in multiple precincts did not sign the precinct registers, that election workers in multiple precincts did not complete and sign the precinct registers, that questioned ballot voters did not sign the questioned ballot voter registers, that election officials did not complete and sign the absentee voting accountability reports, that election officials did not request identification from voters, that election officials destroyed or failed to turn in ballot stubs, that election officials telephoned inaccurate results on election night, that election officials did not properly tally votes or complete tally books, that election

---

[13]    AS 15.20.072(d).

[14]    AS 15.20.072(e).

[15]    Nageak's only evidence of this is that election materials sent from Ambler by mail had not arrived in Nome as of September 6, 2016.  This alone does not support that election officials were untimely in sending the materials.  Further, the numbers from Ambler were available by the time of the recount.

[16]    AS 15.15.440 contemplates that election materials may not arrive in time and allows the Director to rely on a report from the precinct.

officials incorrectly marked spoiled ballots, that election officials did not sign certificates of ballot counts, and that precincts had fewer than the statutorily required number of election officials.  The Division disputes some of these allegations, but these questions of fact are not material to our decision.

### C.    Election Contest Trial In Superior Court

The superior court held an expedited trial on Nageak's election contest complaint.  On October 6, 2016, the court issued a written opinion ordering the Director to decrease Westlake's vote total by 12 and Nageak's vote total by 2 and to certify Nageak as the winner of the primary.  The court ruled against the Division in its actions in counting all votes from Shungnak and in counting the questioned ballots of the voters who voted twice in Kivalina.  The court ruled in favor of the Division on all of Nageak's other arguments.

In addressing the double voting in Shungnak, the superior court ruled that "[t]he actions of the election officials . . . violated clearly established constitutional rights as well as the requirements of statutory law" and that "[t]he actions biased the vote because they occurred in a precinct that lopsidedly favored Mr. Westlake."  It also found "that election officials in Shungnak acted in reckless disregard of the requirements of law" because "[t]hey did not participate in any advance training offered by the Division for the 2016 election; they did not review the materials sent to them; they did not review and follow the instructions on the ballot choice poster and placards sent to them; and they knowingly gave every voter two ballots."  The court made these findings "purely on the basis of [the election officials'] actions" in receiving these materials but nonetheless handing out two ballots, finding "[t]his conduct cannot be characterized as an 'honest mistake.' "

The superior court next considered whether the malconduct by election officials changed the result of the election and concluded that it did.  Two people who

were accepted as expert witnesses testified at trial. Randolph Ruedrich, a former Alaska Republican Party chair, testified for Nageak. John Henry Heckendorn, a partner in the firm that managed Westlake's campaign, testified for Westlake.

Ruedrich testified that an average of 12.75 Shungnak voters chose Republican ballots in primary elections since 2008.[17] He proposed that the court proportionately reduce the vote totals of the candidates in Shungnak by 12.75 votes to approximate what would have happened if Shungnak voters had been forced to choose between ballots in this election, but for the error in giving all Shungnak voters both Republican and ADL ballots. This leads to a reduction of 11.99 votes from Westlake and 0.76 votes from Nageak.

Heckendorn testified that the 2016 primary election was most like the 2012 primary election in that in both years there were no seriously competitive contests on the Republican ballot and there were competitive contests on the ADL ballot. He also presented a spreadsheet of the percentage of voters in District 40 as a whole who chose ADL ballots in the past four primary elections. This spreadsheet showed that the percentage of voters who chose the ADL ballot varied significantly from election to election, but it showed that the percentage of voters in House District 40 excluding Shungnak who chose the ADL ballot in 2016 was almost identical to 2012, another election where there were no competitive contests on the Republican ballot. He therefore proposed that the court should use the percentage of voters who chose the ADL ballot in Shungnak in 2012 to estimate the number of voters who would have chosen the Republican ballot in 2016 but for the error in giving all Shungnak voters both Republican and ADL ballots.

---

[17] The number of voters who chose each ballot is unavailable. Instead both parties have looked to the race on each ballot with the most total votes cast and accepted this as the number of voters who chose to vote that ballot. We do so as well.

The superior court credited the testimony of Ruedrich. The court explained that Ruedrich "performed a precinct-level analysis of how the issuance of two ballots affected the vote," while Heckendorn "presented a mathematical 'what if' analysis of the overall District 40 vote" and "[i]n a conspicuous omission . . . did not present an analysis of the Shungnak precinct vote." Since Ruedrich's method of averaging the total voters choosing the Republican ballot in past elections resulted in Westlake losing 11.99 votes and Nageak losing 0.76 votes, and since the election was decided by only 8 votes, the court concluded that the double voting in Shungnak changed the result of the election. It ordered the Director to reduce Westlake's vote total by 11 and Nageak's vote total by 1.

Regarding the Kivalina questioned ballots, the court heard testimony from election officials that tended to suggest the voters who had insisted on casting two ballots cast their first-choice ballot as an in-person ballot and their second-choice ballot as a questioned ballot. The court ruled that the Director erred in counting the questioned ballots. Since one questioned ballot was for Westlake and one for Nageak, the court ordered the Director to reduce each candidate's vote total by one vote.

As to the Buckland special needs ballots, the court found that nothing in AS 15.20.072 governing special needs ballots prohibits an election official from also serving as a special needs voter's personal representative. The evidence in the record showed that the Division substantially complied with the statute's requirements.

With respect to Nageak's other alleged errors, the court ruled that they "d[id] not show a significant deviation from statutory and constitutional norms" or "knowing or reckless indifference to election laws" and that they "did not result in any bias for one candidate or another. In short, these irregularities were not [systemic], and were instead, isolated and random." The court therefore ruled against Nageak on all his other alleged errors.

The Division and Westlake appeal the superior court's rulings against them. Nageak cross-appeals the court's rulings against him.

### D.    Recount Appeal

Nageak also appeals the Division's recount. He argues that we should exclude all 51 votes from Shungnak because they were cast in violation of the law. Alternatively, he argues that we should apply a proportionate reduction analysis as the superior court did in the election contest. He argues that we should exclude the in-person and questioned ballots of the voters who chose to cast two ballots in Kivalina because casting two ballots violates the law. And he argues that all special needs ballots in Buckland should not be counted.

We consolidated this appeal with the appeal of the superior court judgment in the election contest. In ruling on this recount appeal we have considered the record as presented by the parties, which includes all records and transcripts from the superior court trial on the election contest complaint. The material facts in the appeal are undisputed.

### E.    This Court's Order

On October 12, 2016 we issued an order reversing the superior court's decision with respect to the double voting in Shungnak and reinstating the Director's certification of Westlake as the winner of the election. We affirmed the superior court's decision with respect to all other questions. Our order is attached in the appendix to this opinion. We stated in our order that a written opinion explaining the order would be forthcoming. This opinion now explains our earlier order.

## III. STANDARD OF REVIEW

A recount appeal reviewing the Division's determination is under our direct appellate jurisdiction.[18] "We exercise independent judgment when interpreting statutes which do not implicate an agency's special expertise or determination of fundamental policies."[19]

Whether the conduct of election officials constitutes malconduct and whether that malconduct was sufficient to change the result of an election are questions of law.[20] "We review questions of law de novo, 'adopting the rule of law most persuasive in light of precedent, reason, and policy.' "[21] We review underlying findings of fact for clear error, which "exists when 'our review of the record leaves us with the definite and firm conviction that the superior court has made a mistake.' "[22]

## IV. DISCUSSION

This opinion addresses both the appeal from the superior court in the election contest and the appeal from the Division in the recount. In *Willis v. Thomas* we outlined the difference between an election contest and a recount appeal:

---

[18]     *Cissna v. Stout*, 931 P.2d 363, 366 (Alaska 1996).

[19]     *Id* (citing *Keane v. Local Boundary Comm'n*, 893 P.2d 1239, 1241 (Alaska 1995)).

[20]     *Hammond v. Hickel*, 588 P.2d 256, 258 (Alaska 1978) ("This ultimate legal conclusion is necessarily predicated on two lesser, but critical conclusions of law: (1) a finding of malconduct on behalf of election officials and (2) a finding that such malconduct was sufficient to change the result of the election.").

[21]     *Comsult LLC v. Girdwood Mining Co.*, 397 P.3d 318, 320 (Alaska 2017) (quoting *Girdwood Mining Co. v. Comsult LLC*, 329 P.3d 194, 197 (Alaska 2014)).

[22]     *Ranes & Shine, LLC v. MacDonald Miller Alaska, Inc.*, 355 P.3d 503, 508 (Alaska 2015) (quoting *Gilbert M. v. State*, 139 P.3d 581, 586 (Alaska 2006)).

> In an election contest where no fraud, corruption or ineligibility of a party is alleged, the evidence presented must demonstrate the existence of malconduct sufficient to change the results of the election. . . . In contrast, the inquiry in a recount appeal is whether specific votes or classes of votes were properly counted or rejected. The concept of malconduct does not enter into the question, except insofar as particular acts or shortcomings of election officials may have resulted in the improper counting or rejecting of votes.[23]

A recount appeal may necessarily involve going beyond the four corners of the ballot "to ensure that a vote was cast in compliance with the requirements of Alaska's election laws."[24] But this inquiry is in service of the end question whether the vote should have been counted and not whether election officials committed malconduct sufficient to change the results of the election.[25] As we explain in greater detail below, we address claims with respect to Shungnak and Buckland under the election contest statute and claims with respect to Kivalina under the recount statute.

---

[23] 600 P.2d 1079, 1081 (Alaska 1979).

[24] *Id.* at 1082.

[25] *Id.* at 1081-82. The Division asks us to announce a rule "that a recount appeal is solely a review of the Director's decisions on how to count identifiable votes at the recount." Under the Division's proposed rule the recount appeal would be limited to whether the "votes have been totaled up correctly" and whether "ballots that have been challenged and segregated" should count. The Division acknowledges that this proposed rule would overturn a significant amount of our precedent, likely including *Willis*, *Fischer v. Stout*, 741 P.2d 217 (Alaska 1987), and *Finkelstein v. Stout*, 774 P.2d 786 (Alaska 1989). We decline to do this. We agree with our statement in *Willis* that we must be able to look past the ballot to determine whether the votes were properly counted. We will adhere to our previous rulings on this issue, except for one part of *Finkelstein*. *See infra* notes 39-46 and accompanying text.

## A.    Recount Appeal[26]

Alaska Statute 15.20.510 allows a candidate to appeal the Division's recount determination to this court to determine whether the votes were properly counted. When deciding this question, the overriding principle "is that the voter shall, ordinarily, have his vote recognized and the candidate be given the office to which he is elected if the votes are cast and returned under such circumstances that it can be said it represents the voice of the majority of the voters participating."[27] "The right of the citizen to cast his ballot and thus participate in the selection of those who control his government is one of the fundamental prerogatives of citizenship and should not be impaired or destroyed by strained statutory constructions."[28] We therefore have explained:

> All provisions of the election law are mandatory, if enforcement is sought before election in a direct proceeding for that purpose; but after election all should be held directory only, in support of the result, unless of a character to affect an obstruction to the free and intelligent casting of the vote or to the ascertainment of the result, or unless the provisions affect an essential element of the election, or unless it is expressly declared by the statute that the particular act is essential to the validity of an election, or that its

---

[26]    The Division argues that Nageak only challenged the Kivalina ballots in the recount and that the rest of his claims should be considered waived. We disagree. "[O]ur obligation under AS 15.20.510 is to review any and all questioned ballots cast in the election at issue, regardless of whether they were or were not specifically challenged below." *Fischer*, 741 P.2d at 220.

[27]    *Carr v. Thomas*, 586 P.2d 622, 626 (Alaska 1978).

[28]    *Id.* (quoting *Sanchez v. Bravo*, 251 S.W.2d 935, 938 (Tex. Civ. App. 1952)).

omission shall render it void.[29]

"Courts are reluctant to permit a wholesale disenfranchisement of qualified electors through no fault of their own."[30]

### 1.     Double voting in Shungnak

Alaska Statute 15.25.060(b) provides, "A voter may vote only one primary election ballot."  It is undisputed that all voters in Shungnak received and cast both the ADL and the Republican ballots.  This was an error by Shungnak election officials. Nageak argues that we should not count any of the 51 votes from Shungnak, or alternatively, that we should proportionately reduce the number of Shungnak votes as the superior court did in the election contest.  We conclude that challenges to elections based on election official error that go beyond the facial validity of the votes cast may not be brought under Alaska's recount statute and therefore decline to discard the Shungnak votes on this basis.

Two distinct statutes allow for challenges to Alaskan elections.  Alaska Statute 15.20.510 allows for a candidate to appeal a recount determination of the Division to this court to determine whether the votes were properly counted.  A recount appeal covers "what ballots, parts of ballots, or marks for candidates on ballots are valid, and to which candidate . . . the vote should be attributed."[31]  This is necessarily a wide-ranging inquiry, but "[t]he concept of malconduct does not enter into the question, except insofar as particular acts or shortcomings of election officials may have resulted in the

---

[29]     *Finkelstein*, 774 P.2d at 790 (quoting *Willis*, 600 P.2d at 1083 n.9).

[30]     *Carr*, 586 P.2d at 626.

[31]     AS 15.20.510.

improper counting or rejecting of votes."[32]  Alaska Statute 15.20.540 covers issues of "malconduct, fraud, or corruption on the part of an election official sufficient to change the result of the election."[33]

"It is clear from the existence of the two statutes that an election contest and a recount appeal are distinct proceedings."[34]  Election contest complaints can include corrupt practices by non-election officials,[35] but the vast majority of election contest case law concerns errors by election officials.[36]  Errors by election officials, like the double voting in Shungnak, should be considered as election contest issues, not as recount issues.  Allowing votes to be discarded in a recount appeal solely for errors of election officials would largely merge these two distinct statutes and eliminate the need to file election contest complaints.  Challenges to the actions of election officials that go beyond the facial validity of the votes cast should be brought under the election contest statute, and challenges to the counting of votes should be brought under the recount appeal statute.

Our case law is largely consistent with this division.  Our cases reflect that voters who are qualified to vote and who cast timely ballots should not have their votes

---

[32]     *Willis*, 600 P.2d at 1081.

[33]     AS 15.20.540(1).

[34]     *Willis*, 600 P.2d at 1081; *see also Miller v. Treadwell*, 245 P.3d 867, 874-75 (Alaska 2010).

[35]     *See* AS 15.20.540(3); *Dansereau v. Ulmer*, 903 P.2d 555, 567-71 (Alaska 1995).

[36]     *See DeNardo v. Municipality of Anchorage*, 105 P.3d 136, 140-43 (Alaska 2005); *Dansereau*, 903 P.2d at 560-66, 571-73; *Hammond v. Hickel*, 588 P.2d 256 (Alaska 1978); *Boucher v. Bomhoff*, 495 P.2d 77 (Alaska 1972); *Turkington v. City of Kachemak*, 380 P.2d 593 (Alaska 1963).

discounted under the recount statute because of improper conduct of election officials. We concluded that votes should be counted when voters were not registered to vote because the registrars failed to send the registration applications to the Division in *Willis v. Thomas*[37] and when a confusing registration card caused a voter to accidentally check a box canceling his registration in *Fischer v. Stout*.[38]

The outlier in our case law on this distinction is *Finkelstein v. Stout*, a case that involved a recount appeal of the 1988 general election for a state representative.[39] A statute required that an absentee-ballot voter sign a voter's certificate on the ballot's envelope and that two people witness the voter's signature.[40] The instructions that the Division gave to absentee ballot voters, however, suggested that all that was required was that the two witnesses witness that the ballots had been signed.[41] Thirty-two voters submitted absentee ballots that had two witness signatures with two different dates,[42] meaning the acts of signing were not witnessed simultaneously by two people.[43] We held that the requirement that two witnesses witness an absentee ballot voter sign the voter's certificate on the envelope was "of a character to affect an obstruction to the free and intelligent casting of the vote . . . or to . . . affect an essential element of the election" and

---

[37]    600 P.2d at 1087.

[38]    741 P.2d 217, 224 (Alaska 1987).

[39]    774 P.2d 786, 787 (Alaska 1989).

[40]    *Id.* at 789-90.

[41]    *Id.* at 793 (Rabinowitz, J., dissenting).

[42]    *Id.* at 788 (majority opinion).

[43]    *Id.* at 790.

ruled that these votes should not be counted.[44] But as in *Fischer* and *Willis*, recount appeals in which we declined to discard votes based on election official error, this error in *Finkelstein* was also "solely on the part of election officials."[45] We now believe the claim in *Finkelstein* should have been argued and decided in an election contest case and not a recount appeal. Accordingly, we disavow this aspect of *Finkelstein*. Future election challengers should bring only an election contest case if they are alleging only "malconduct, fraud, or corruption on the part of an election official."[46]

## 2. Questioned ballots in Kivalina

It is undisputed that seven voters in Kivalina insisted on casting both the ADL and Republican ballots. Election officials in Kivalina required each voter to cast one in-person ballot and one questioned ballot. Of these seven questioned ballots, five were Republican ballots and two were ADL ballots, with the latter producing one vote for each candidate. The Director initially did not count these questioned ballots, but in the recount the Director decided to count them.[47] This was error based on the statutory

---

[44]     *Id.* at 791 (alteration in original).

[45]     *Id.* at 794 (Rabinowitz, J., dissenting) (quoting *Fischer v. Stout*, 741 P.2d 217, 225 (Alaska 1987)).

[46]     AS 15.20.540(1).

[47]     After the Director initially decided not count the questioned ballots, Nageak challenged this decision. The Division argues that Nageak cannot now argue the ballots should not have been counted after arguing the opposite during the recount stage. The Division does not cite any authority for this position, and we have previously stated that our obligation under AS 15.20.510 "must extend to a review of all ballots questioned on any basis. . . . regardless of whether they were or were not specifically challenged below." *Fischer*, 741 P.2d at 220.

requirement that each voter cast only one primary ballot.[48]  A challenge based on this error can properly be brought under the recount statute as the error at issue goes not to malconduct on the part of Kivalina election officials, who acted properly, but rather to whether the votes were properly counted.[49]

In justifying her decision, the Director said that it was impossible to know which ballot voters intended as their first choice.  We are not convinced by this explanation. Casting an in-person ballot and casting a questioned ballot are substantially different procedures.  An in-person ballot is cast through the normal process of filling out a ballot and placing it in a ballot box (or using a touchscreen device).  A questioned ballot is placed in an envelope and set aside; voters sign a questioned ballot register.  We hold that a person who casts one in-person and one questioned ballot can be presumed to have intended the in-person ballot to be the first choice ballot if only one is to count.

Nor are we convinced by Nageak's argument that these seven voters chose to break the law and that their votes should not be counted as a result.  On the record before us, there is no evidence suggesting the voters chose to break the law; it appears they merely misunderstood the applicable law and elected to cast questioned ballots.  All of Kivalina's in-person votes should be counted, but the two relevant questioned ballots should not be.[50]  Since these two ballots were counted, we order the Director to subtract one vote from the vote total of each candidate.

### 3.    Special needs ballots in Buckland

---

[48]    AS 15.25.060(b).

[49]    *See Willis v. Thomas*, 600 P.2d 1079, 1081 (Alaska 1979).

[50]    We do not disturb the vote totals in the Republican primary.  The Division did not conduct a recount of the Republican ballots, and no recount appeal from that primary is before us.  Further, the Director did not count the Kivalina questioned ballots in her initial vote tally, only deciding to count them when recounting the ADL ballots.

Nageak argues that election officials erred in serving as election representatives for 12 special needs voters in Buckland. Because Nageak alleges improper conduct on the part of election officials and not improper counting of votes we consider this challenge as an election contest.

### 4. Summary

The alleged errors in Shungnak and Buckland were "solely on the part of election officials."[51] They therefore are properly the subject of an election contest and not a recount appeal. Because the Director properly counted the ballots of voters in Shungnak and special-needs voters in Buckland in the recount, we affirm the Director's recount decisions in Shungnak and Buckland. It was error to count the two questioned ballots in Kivalina. We therefore order the Director to subtract one vote from each candidate in Kivalina.

## B. Election Contest

Alaska Statute 15.20.540 allows "[a] defeated candidate or 10 qualified voters" to contest an election on grounds that include "malconduct . . . on the part of an election official sufficient to change the result of the election." We first consider whether the errors Nageak alleges constitute malconduct and then whether the malconduct was sufficient to change the result of the election.

### 1. Malconduct

Alaska Statute 15.20.540 "parallels the 'directory' view that statutes prescribing election procedures and ballot forms are directory and that they therefore establish a desirable rather than mandatory norm."[52] Thus, parties contesting the election outcome must "show more than a lack of total and exact compliance with the

---

[51] *Fischer*, 741 P.2d at, 223-24 (quoting *Willis*, 600 P.2d at 1087).

[52] *Boucher v. Bomhoff*, 495 P.2d 77, 80 (Alaska 1972).

constitutionally and statutorily prescribed form of ballot" and "ha[ve] the dual burden of showing a significant deviation from the prescribed form and that such departure was of a magnitude sufficient to change the result of the . . . election."[53]

In *Hammond v. Hickel* we explained that "[i]f a bias has been introduced into the vote, . . . 'malconduct' exists if the bias can be shown to be the result of a significant deviation from lawfully prescribed norms."[54] "Significant deviations which impact randomly on voter behavior will amount to malconduct if the significant deviations from prescribed norms by election officials are imbued with scienter, a knowing noncompliance with the law or a reckless indifference to the norms established by law. Thus, evidence of an election official's good faith may preclude a finding of malconduct in certain circumstances."[55]

### a.     Double voting in Shungnak

As explained above, election officials in Shungnak allowed each voter to cast both the Republican and ADL ballots in contravention of clear statutory language. The superior court determined that this was a significant deviation from lawfully prescribed norms. On appeal, the Division argues that providing both ballots was not a significant deviation because every voter who voted in the Democratic primary was eligible to do so and because no voter voted for more than one candidate in the House District 40 race. We disagree. Voters who would have chosen the Republican ballot should not have been allowed to vote in the Democratic primary.[56] The converse is true

---

[53]    *Id.*

[54]    588 P.2d 256, 258-59 (Alaska 1978).

[55]    *Id.* at 259 (footnote omitted).

[56]    *See* AS 15.25.060(b).

for voters who would have chosen the ADL ballot.[57] But Shungnak voters were allowed to cast both ballots, while voters outside of Shungnak were not, giving Shungnak voters a slightly greater say in the election.[58] Allowing voters to cast two ballots was a significant deviation from lawfully prescribed norms.

The superior court found that "election officials in Shungnak acted in reckless disregard of the requirements of law." It explained that "[j]udging purely on the basis of their actions," elections officials "did not participate in any advance training offered by the Division for the 2016 election; they did not review the materials sent to them; they did not review and follow the instructions on the ballot choice poster and placards sent to them; and they knowingly gave every voter two ballots."

The Division argues that "[t]he record in fact contains no evidence about whether the poll workers reviewed the materials" and that "Nageak failed to present any evidence at all about the motives of the Shungnak poll workers." The Division notes that poll workers are local residents hired for a brief amount of time and tasked with numerous responsibilities. In this context, the Division argues, the Shungnak election officials' error should be viewed as "an honest mistake" that constituted "at worst, negligence."

"We review a trial court's findings of fact for clear error," which "exists when 'our review of the record leaves us with the definite and firm conviction that the

---

[57] *See id.*

[58] *See Bush v. Gore*, 531 U.S. 98, 105 (2000) ("It must be remembered that 'the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.' " (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964))); *see also id.* at 104-10.

superior court has made a mistake.' "[59] The superior court's finding was based on uncontested facts or reasonable inferences from those facts. The court did not clearly err in finding that election officials in Shungnak acted with "reckless disregard to the requirements of law." We therefore affirm the superior court's finding that the errors of Shungnak election officials constituted malconduct.[60]

---

[59] *Ranes & Shine, LLC v. MacDonald Miller Alaska, Inc.*, 355 P.3d 503, 508 (Alaska 2015) (quoting *Gilbert M. v. State*, 139 P.3d 581, 586 (Alaska 2006)).

[60] The court also found that the election officials' actions constituted bias "because they occurred in a precinct that lopsidedly favored Mr. Westlake." This was error. Bias exists at the malconduct stage when conduct of election officials influences voters to vote a certain way. *See Boucher v. Bomhoff*, 495 P.2d 77 (Alaska 1972) (concluding that the addition of misleading language influenced voters to vote a certain way and constituted malconduct). There is no evidence that election officials in Shungnak influenced voters to vote for any particular candidate. The effect of election officials' conduct on the outcome of an election goes to whether any malconduct was sufficient to change the outcome of the election and not to whether there was malconduct. *See Fischer v. Stout*, 741 P.2d 217, 226 (Alaska 1987) (discussing the method for "determin[ing] the effect of any bias that affected individual votes in a random fashion").

The court also found that "[t]he actions of the election officials in Shungnak in issuing every voter both ballots violated clearly established constitutional rights as well as the requirements of statutory law" and that "[g]iven the constitutional dimensions of these actions and the scale on which they occurred, . . . [the actions] constitute[d] malconduct." We have never held that a deviation was significant enough from the norm to constitute malconduct absent scienter or bias, but we also have not foreclosed the possibility of demonstrating malconduct by showing good faith maladministration. In *Hammond* we said that "evidence of an election official's good faith *may* preclude a finding of malconduct *under certain circumstances*" and that "[i]n common usage, malconduct is defined as: 'Ill conduct, especially dishonest conduct, *maladministration*, or, as applied to officers, official misconduct.' " *Hammond*, 588 P.2d at 259 & n.3 (emphasis added) (quoting *Malconduct*, BLACK'S LAW DICTIONARY (rev. 4th ed. 1968)). In determining whether there was a "corrupt practice" under the election contest statute, AS 15.20.540(3), we have asked whether "the purpose of [a] statute has been satisfied."

(continued...)

### b.    Questioned ballots in Kivalina

The superior court ruled the Director erred in counting the questioned ballots of voters in Kivalina who cast two ballots, and the court ordered one vote be subtracted from each candidate.  While we agree that the Director should not have counted the questioned ballots, we do not agree that the superior court should have altered the vote total under the election contest statute.  Election officials in Kivalina made a reasonable decision as to how to handle voters who wished to cast both ballots.  Nageak points to no statute that suggests election officials should have acted differently, let alone that their conduct was a significant deviation from lawfully prescribed norms.  Indeed, he concedes that the election officials did not err.  The superior court's opinion focused on the Director's decision to count these votes in the recount.  But this question addresses solely which votes should be counted and does not involve allegations of election official malconduct.  It therefore is a question for a recount appeal, in which this court has direct appellate jurisdiction from the Division, and not for an election contest in superior court.[61]  Further, the decision of neither the election officials nor the Director

---

[60](...continued)
*Dansereau v. Ulmer*, 903 P.2d 555, 568 (Alaska 1995).  And under the recount appeal statute we ask whether a statutory violation is "of a character to affect an obstruction to the free and intelligent casting of the vote or the ascertainment of the result, or. . . the provisions affect an essential element of the election."  *Carr v. Thomas*, 586 P.2d 622, 626 (Alaska 1978) (quoting *Rich v. Walker*, 374 S.W.2d 476, 478 (Ark. 1964)); *see also Boucher*, 495 P.2d at 80 (noting that the malconduct inquiry "parallels the 'directory' view that statutes prescribing election procedures and ballot forms are directory and that they therefore establish a desirable rather than mandatory norm").  We need not decide here whether the error in Shungnak would have constituted malconduct absent the finding of recklessness.

[61]    *See Willis v. Thomas*, 600 P.2d 1079, 1081-82 (Alaska 1979) (holding that questions involving which ballots to count were recount appeal questions and not
(continued...)

could be sufficient to change the result of the election: each candidate received one vote in the questioned ballots from Kivalina.

We disagree with the superior court's choice to treat the questioned ballots in Kivalina as an election contest question. But we affirm the court's decision on the alternative ground discussed above in our recount appeal analysis: the Director erred in counting the two questioned ballots.

### c. Special needs ballots in Buckland

It is undisputed that election officials acted as election representatives for 12 special needs voters in Buckland. Nageak argues that this practice violates the statute that authorizes special needs voting. That statute provides that a voter who is unable to go to a polling place because of a disability "may, through a representative, request a special needs ballot from" election officials.[62] "The representative shall deliver the special needs ballot and other voting materials to the voter as soon as practicable,"[63] witness the voter placing the completed ballot into the envelope (after the voter has completed the ballot privately), and then "deliver the ballot and voter certificate to an election official not later than 8:00 p.m. Alaska time on election day."[64] Nageak argues that this system of voting requires three separate people — an election official, a representative, and a voter — and that election officials may not serve as representatives. We disagree.

Nowhere in the statute does it say that the election official and the

---

[61](...continued)
election contest questions).

[62]     AS 15.20.072(a)-(b).

[63]     AS 15.20.072(d).

[64]     AS 15.20.072(e).

representative may not be the same person. This absence is striking given that the statute contains a list of other people who may not serve as representatives.[65] Nor does the purpose of the act require that the election official and the representative be two different persons. The obvious purpose of this statute is to facilitate voting by persons who have special needs. The success of the arrangement in Buckland — 12 disabled voters, 11 of whom were 64 years of age or older — suggests that election officials serving as representatives may be an efficient practice in rural villages. We see nothing in the statute that prohibits this. We also cannot agree with Nageak's argument that this practice "risks the integrity of the ballot process"; if anything, one fewer person in the process should make the ballot more, not less, secure.

Because we hold that an election official may also serve as a representative, the conduct of election officials in Buckland was not a significant deviation from lawfully prescribed norms.[66]

### d. Alleged cumulative malconduct

Nageak alleges numerous other actions by election officials that he argues constitute cumulative malconduct.[67] We agree with the superior court that no cumulative

---

[65]     AS 15.20.072(g) ("The voter's employer, an agent of the voter's employer, or an officer or agent of the voter's union may not act as a representative for the voter. A candidate for office at an election may not act as a representative for a voter in the election.").

[66]     Nageak also argues that election officials failed to record the date and time the special needs ballots were returned to the precinct. But he does not identify any statute or regulation that requires this information be recorded.

[67]     Nageak alleges that there were delays in returning election materials, that Browerville election officials required Republicans seeking to vote the ADL ballot to cast a questioned ballot, that a felon ineligible to vote voted, and that voters and election officials in multiple precincts did not complete or sign required paperwork. He also

(continued...)

malconduct occurred.  In *Hammond* we theorized:

> It may be that, in rare circumstances, an election will be so permeated with numerous serious violations of law, not individually amounting to malconduct, that substantial doubt will be cast on the outcome of the vote. Under such circumstances, cumulation of irregularities may be proper and will support a finding of malconduct.[68]

But we have never been presented with a case where we found a cumulation of irregularities that constituted malconduct.  And the Minnesota case we cited for the proposition that cumulative malconduct may cast doubt on the outcome of the election contained facts far worse than what allegedly occurred here.[69]  We explained in *Hammond* that Alaska elections present "[u]nique problems . . . in the vast area encompassed as well as the varied cultural backgrounds and primary languages of voters."[70]  Nowhere is this more true than in House District 40.  "Under these circumstances minor irregularities and other good faith errors and omissions may be anticipated, although we do not condone any such departures from lawful

---

**67**(...continued) alleges that election officials did not request identification from voters, destroyed or failed to turn in ballot stubs, telephoned inaccurate results on election night, did not properly tally votes, incorrectly marked spoiled ballots, failed to sign certificates of ballot counts, and that precincts had fewer than the statutorily required number of election officials.

**68**     *Hammond v. Hickel*, 588 P.2d 256, 259 (Alaska 1978) (citing *In re Contest of Election of Vetsch*, 71 N.W. 2d at 652 (Minn. 1955)).

**69**     In *In re Contest of Election of Vetsch* more votes were cast than registered voters in the precinct, many ballots were unaccounted for, the leader of the election board favored the winning candidate, and some of the people counting the votes were statutorily barred due to conflicts of interest.  71 N.W.2d at 655-56.

**70**     *Hammond*, 588 P.2d at 259.

requirements."[71]   Nageak has not shown sufficient facts to establish cumulative malconduct.

## 2.     Sufficient to change the result of the election

Because we affirm that malconduct occurred in Shungnak, we must now decide whether Nageak has shown that this malconduct was "sufficient to change the result of the election."[72]  We conclude that he has not.[73]

---

[71]     *Id.*

[72]     AS 15.20.540(1).

[73]     The dissent states that we have "subtly change[d] the standard we have used in past cases to assess whether malconduct affected the election, deciding that Nageak was required to show not just that the malconduct *could* have changed the result . . . but that it *would* have changed the result."  The dissent argues that "[t]his standard is too high" because "even a probability less than 50% should be adequate to meet the purpose of an election contest."   In response we note that our opinions have fairly interchangeably asked both whether the malconduct *could* have changed the result and whether it *would* have changed the result.  *See, e.g.*, *Hammond*, 588 P.2d at, 260 (Alaska 1978) ("The method used to determine if the malconduct *could* have changed the result of the election will depend upon whether the malconduct injected a bias into the vote. If the bias has tended to favor one candidate over another and the number of votes affected by the malconduct can be ascertained with precision, all such votes will be awarded to the disfavored candidate to determine if the result of the election *would* be changed. . . .  Finally, if the malconduct has a random impact on votes and those votes cannot be precisely identified, we hold that the contaminated votes must be deducted from the vote totals of each candidate in proportion to the votes received by each candidate in the precinct or district where the contaminated votes were cast. . . .  The invalid votes will be deducted in this pro rata fashion to determine if the malconduct *could* have affected the result of the election." (emphasis added)); *Fischer v. Stout*, 741 P.2d 217, 226 (Alaska 1987) ("In *Hammond*, we discussed the proportionate reduction rule as the only method to properly determine the effect of any bias that affected individual votes in a random fashion. . . .  [T]he technique was to be used only as an analytical tool to aid in the determination of whether the contaminated ballot actually *would* [a]ffect the result of the election." (emphasis added) (citing *Hammond*, 588 P.2d
(continued...)

The 2016 Republican primary election in House District 40 was a comparatively uncontroversial primary election; by uncontroversial, we mean that the races on that ballot were not close or heated. On the Republican ballot, incumbent Republican U.S. Senator Lisa Murkowski was running against three challengers, whom she beat by significant margins.[74] Incumbent Republican U.S. Representative Don Young was also running against three challengers, and he also beat them by significant

_____

(...continued)
at 260)); *Finkelstein v. Stout*, 774 P.2d 786, 793 (Alaska 1989) ("If application of the proportional reduction formula *does not change* the provisional result . . . , the Director should certify the prevailing candidate forthwith. . . . If application of the proportional reduction formula *would change* the provisional result . . . , a new election should be held promptly." (emphasis added)). To the extent this leaves ambiguity, we decline to resolve it now other than by reaffirming the principle that "every reasonable presumption will be indulged in favor of the validity of an election." *Dansereau v. Ulmer*, 903 P.2d 555, 559 (Alaska 1995) (quoting *Turkington v. City of Kachemak*, 380 P.2d 593, 595 (Alaska 1963)).

We have described ordering a new election as an "extreme remedy." *Hammond*, 588 P.2d at 259. This is at least partly because a second election is usually a poor approximation of the first election: among other concerns, voter turnout is likely to differ significantly, and there is no guarantee that the second election will be any more problem-free than the first. *See Huggins v. Superior Court*, 788 P.2d 81, 84 (Ariz. 1990). This case provides a good example of some of the issues with holding a new election. The problem in Shungnak was that all voters were allowed to vote the ADL ballot, rather than being forced to choose between the ADL and Republican ballots. But a second election would have no Republican ballot. Once again, all voters would be allowed to vote the ADL ballot because there would be no Republican option.

We reaffirm that we will order a new election only if an election challenger has shown malconduct sufficient to change the result and only after indulging every reasonable presumption in favor of the validity of the election. Nageak has not made the necessary showing.

[74] *See* DIV. OF ELECTIONS, 2016 PRIMARY ELECTION: ELECTION SUMMARY REPORT 1 (2016), http://www.elections.alaska.gov/results/16PRIM/.

margins.[75]

Significantly, there were no state representative candidates running on the Republican ballot for House District 40.[76] Only the ADL ballot had candidates running for state representative — incumbent Democratic state representative Nageak and Democratic challenger Westlake. Nageak, though a registered Democrat, caucused with the Republican House caucus and was supported by the Alaska Republican party. Westlake, also a registered Democrat, was supported by the Democratic Party. The significance of these facts is that, had the Shungnak election officials not provided both ADL and Republican ballots to all Shungnak voters, a voter in Shungnak who wanted to vote for a "Republican" state house candidate (that is, Nageak) *had* to choose the ADL ballot. A voter who chose the Republican ballot would be able to vote in the relatively noncompetitive national congressional races on the Republican ballot but would *forfeit* the opportunity to vote in the contested local state house race between a "Republican" and a Democratic candidate.

Because all 50 in-person voters in Shungnak were given both ballots, all 50 voters were able to vote for a state house candidate. Nageak received 3 votes and Westlake received 47. Although all 50 in-person voters voted the ADL ballot because of election official error, as we explain below it is likely that almost all of these voters still would have voted the ADL ballot if forced to choose because this is how voters in Shungnak voted in comparable elections. Since Westlake won by 8 votes overall in House District 40, the error of election officials in Shungnak was harmless unless at least

---

[75] *See id.*

[76] There were no state senate candidates for Senate District T on the Republican ballot either.

8 of the 47 voters who voted for Westlake would have chosen the Republican ballot.[77]

The superior court adopted the method proposed by Nageak's expert, Ruedrich, who used the average number of voters who chose the Republican ballot in 2008, 2010, 2012, and 2014 to approximate the number of voters who would have chosen the Republican ballot in 2016 if forced to choose.[78] But this method fails to take into account the significant differences on the ballots in different years' elections, differences Ruedrich acknowledged. As discussed above, the 2016 Republican primary election in House District 40 was comparatively uncontroversial. This had not been the case in other recent primary elections. The 2008 Republican primary election included a very close, hotly contested race between Republican then-Lieutenant Governor Sean Parnell and Republican incumbent Don Young for U.S. Representative; Young won 45.47% to Parnell's 45.19%.[79] The 2010 Republican primary included a high-profile contest between Republican challenger Joe Miller and Republican incumbent

---

[77] Even if eight Shungnak voters would have chosen the Republican ballot if forced to choose, it is not clear that only Westlake's vote total would be affected. The three Shungnak voters who voted for Nageak may have done so because he caucused with Republicans in the House and was considered the "Republican" candidate. If they would have chosen the Republican ballot if forced to choose then Nageak would have to make up the loss of those three votes as well as gain an additional eight net votes from Shungnak Westlake voters who might have chosen the Republican ballot. See *Talbott v. Thompson*, 182 N.E. 784, 789 (Ill. 1932) and *Leach v. Johnson*, 313 N.E.2d 636, 640-42 (Ill. App. 1974) for cases using party affiliation to determine the outcome of elections when over voting has occurred.

[78] The 2008 primary election was the first election to have the choice between an ADL and Republican ballot.

[79] *See* DIV. OF ELECTIONS, 2008 PRIMARY ELECTION: ELECTION SUMMARY REPORT 1 (2008), http://www.elections.alaska.gov/results/08PRIM/data/results.pdf.

Lisa Murkowski for U.S. Senator; Miller won 50.91% to Murkowski's 49.09%.[80]  The 2010 Republican primary also included contested races for Governor and Lieutenant Governor.[81]  And the 2014 primary election had a competitive race on the Republican ballot for U.S. Senator.[82]  The 2014 ADL ballot also had Westlake challenging Nageak in the Democratic primary.  Only in 2012 was the Republican primary essentially uncontroversial in the same way as 2016 at the same time as there was a competitive Democratic primary election for House District 40.[83]  Likely because of these differences, a significantly higher percentage of voters in Shungnak and the rest of House District 40 chose the ADL ballot in 2012 than in 2008 and 2010; and a slightly higher percentage chose the ADL ballot in 2012 than 2014, as the following table shows.[84]

---

[80]     *See* DIV. OF ELECTIONS, 2010 PRIMARY ELECTION: ELECTION SUMMARY REPORT 1 (2010), http://www.elections.alaska.gov/results/10PRIM/data/results.pdf.

[81]     *See id.*

[82]     *See* DIV. OF ELECTIONS, 2014 PRIMARY ELECTION: ELECTION SUMMARY REPORT 1 (2014), http://www.elections.alaska.gov/results/14PRIM/data/results.pdf.

[83]     *See* DIV. OF ELECTIONS, 2012 PRIMARY ELECTION: ELECTION SUMMARY REPORT 1, 3, 9 (2012), http://www.elections.alaska.gov/results/12PRIM/data/results.pdf.

[84]     As discussed above, the Division does not record the number of ADL versus R ballots cast in each election. *See supra* note 17. In the following table, we use the method relied on by the parties: the number of votes cast in the race with the most votes on each ballot (ADL or R).  This method provides consistency across both election years and geographic scales (Shungnak, House District 40, and statewide).  In addition, when calculating the percentage of ADL ballots, we believe the proper denominator is the total number of ADL and Republican ballots cast in a given election, excluding separate ballots for initiatives.  We note that this differs from the method used by Heckendorn, who relied on the total number of ballots cast.  We disagree with Heckendorn's method because the relevant comparison for our purposes is between ADL and Republican ballots (which are mutually exclusive), rather than separate initiative

(continued...)

|       | Shungnak |     |        | HD 40 excluding Shungnak |     |        |
| ----- | -------- | --- | ------ | ------------------------ | --- | ------ |
| Year  | ADL      | R   | % ADL  | ADL                      | R   | % ADL  |
| 2008  | 38       | 15  | 71.7%  | 1762                     | 904 | 66.1%  |
| 2010  | 32       | 18  | 64.0%  | 1049                     | 816 | 56.2%  |
| 2012  | 53       | 7   | 88.3%  | 1926                     | 417 | 82.2%  |
| 2014[85] | 56    | 11  | 83.6%  | 2068                     | 751 | 73.4%  |
| 2016  | —        | —   | —      | 1590[86]                 | 426 | 78.9%  |

We believe that the qualitative comparative differences in the nature of the primary elections over a period of years are legally significant factors and that the legal methodology for determining whether the malconduct was sufficient to change the result of the election must account for these important factors. Because simple averaging of the number of voters who chose the Republican ballot in past elections does not take into account these legally significant factors, it was legal error for the superior court to adopt Ruedrich's method to determine whether malconduct was sufficient to change the outcome of the election.[87]

---

[84](...continued)
ballots (which everyone may cast).

[85] The boundary of House District 40 shifted for the 2014 election. *Compare* Appendix p. 3, *with* ALASKA REDISTRICTING BD., AMENDED PROCLAMATION HOUSE DISTRICTS: HOUSE DISTRICT 40 (2011), http://www.elections.alaska.gov/doc/maps/2011-districts/HD40.pdf (district for 2012 election).

[86] This total reflects our subtraction of one vote from each candidate in Kivalina.

[87] We do not disturb any of the superior court's factual findings with respect to its sufficiency analysis. We accept the court's findings as to what occurred in Shungnak and the court's assessment of the credibility of the two expert witnesses. But

(continued...)

Westlake's expert, Heckendorn, did consider these qualitative differences. He compared the qualitatively similar 2012 and 2016 elections and used the percentage of voters in Shungnak who chose the ADL ballot in 2012 as an estimate of the number of voters who would have chosen the ADL ballot in 2016 if forced to choose between the ADL and Republican ballots. To characterize Heckendorn's methodology in familiar terms, comparing the 2012 and 2016 ballots compared apples to apples; but when one adds the 2008, 2010, and 2014 ballots into the analysis one ends up comparing apples

---

[87](...continued)
the correct method or formula for calculations is generally a question of law that we review de novo. *See, e.g.*, *Sherrill v. Sherrill*, 373 P.3d 486, 490 (Alaska 2016) ("We review de novo child support issues that involve '. . . determining the correct method for calculating child support.' " (quoting *Wells v. Barile*, 358 P.3d 583, 587-88 (Alaska 2015))); *Kollander v. Kollander*, 322 P.3d 897, 903 (Alaska 2014) ("Whether the court applied the proper legal analysis to calculate attorney's fees is a question of law we review de novo." (quoting *Weimer v. Cont'l Car & Truck, LLC*, 237 P.3d 610, 613 (Alaska 2010))); *Dixon v. Blackwell*, 298 P.3d 185, 188 (Alaska 2013) ("Calculation of the value of a verdict to determine if it exceeded an offer of judgment presents questions of law, which we review de novo." (quoting *Power Constructors, Inc. v. Taylor & Hintze*, 960 P.2d 20, 34 (Alaska 1998))); *Carlson v. State, Commercial Fisheries Entry Comm'n*, 919 P.2d 1337, 1339 (Alaska 1996) ("The issue of whether the superior court erred in adopting the pro rata formula to calculate the contribution to commercial fisheries management made by residents is also an issue of law which we review de novo.").

Similarly, we have explained that the *Hammond* formula sets as a matter of law the proper method for determining sufficiency under AS 15.20.540 when the number of improper votes is known. *Hammond v. Hickel*, 588 P.2d 256, 258 (Alaska 1978) ("This ultimate legal conclusion is necessarily predicated on two lesser, but critical conclusions of law: (1) a finding of malconduct on behalf of election officials and (2) a finding that such malconduct was sufficient to change the result of the election."); *id.* at 260 ("We believe that more concrete standards must be applied in order to determine if votes affected by malconduct are sufficient in number to change the result of the election."). We therefore review de novo the method "applied in order to determine if [the] votes affected by malconduct [were] sufficient in number to change the result of the election." *Id.*

to apples and oranges, a legally invalid comparison. The Division agrees with Heckendorn's method of analysis and so do we.

We do not hold that Heckendorn's method is the only or best method for determining how many voters would have chosen the ADL and Republican ballots if forced to choose. But his method at least focuses on legally relevant information and disregards factors that would bias the outcome. Because the 2012 primary election and the 2016 primary election were qualitatively similar elections,[88] we are assured that the comparison between these two elections is a legally valid apples-to-apples comparison. Heckendorn's method appropriately considered the legally significant factors that Ruedrich's method failed to consider.

Using the percentage of Shungnak voters who chose the ADL ballot in 2012 to determine the percentage of voters who likely would have chosen the ADL ballot in 2016 results in the conclusion that 5.83 voters would have chosen the Republican ballot. Even rounding up to 6 votes and subtracting all 6 from Westlake's 47 does not give Nageak the net gain of 8 votes he needed to change the outcome of the election.

It was Nageak's burden to show that the malconduct in Shungnak was sufficient to change the result of the election,[89] and "every reasonable presumption will be indulged in favor of the validity of an election."[90] We have concluded that Nageak's method is legally invalid because it employs a mere average of the number of voters who chose the Republican ballot over a number of elections including elections that were

---

[88]     The 2012 and 2016 elections were also quantitatively similar because a similar percentage of voters in House District 40 outside Shungnak chose the ADL ballot in 2012 and 2016, as the table shows.

[89]     *Boucher v. Bomhoff*, 495 P.2d 77, 80 (Alaska 1972).

[90]     *Dansereau v. Ulmer*, 903 P.2d 555, 559 (Alaska 1995) (quoting *Turkington v. City of Kachemak*, 380 P.2d 593, 595 (Alaska 1963)).

materially dissimilar to the 2016 election. Thus it was legal error for the superior court to rely on and apply Nageak's flawed methodology, and we conclude Nageak has not met his burden of proving that the election officials' malconduct was sufficient to change the outcome of the election.[91] We reverse the superior court's decision on this point.[92]

## V.     CONCLUSION

It was error for the superior court to conclude that the malconduct in

---

[91]     We note that the superior court did not order a new election but instead ordered the Director to certify Nageak as the winner based on its proportionate reduction. But we have never proclaimed a new winner based on a proportionate reduction analysis, and we have admonished Directors for applying proportionate reduction analyses to change vote totals instead of submitting the question to us. *Fischer*, 741 P.2d at 225-26. Indeed, changing an election result based on a proportionate reduction in votes is unprecedented in Alaska law and is an even more "extreme remedy" than ordering a new election. *See id.* at 226 ("In *Hammond*, we discussed the proportionate reduction rule as the only method to properly determine the effect of any bias that affected individual votes in a random fashion. We did not intend, however, that the technique was to be used to actually reduce the candidate's official total."); *Hammond*, 588 P.2d at 259 ("There were no such numerous serious violations as to permeate the entire election process, so as to require the extreme remedy of a new election.").

[92]     Nageak argues that the double voting in Shungnak caused some voters to have more power than others and thus violated constitutional requirements: "[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Bush v. Gore*, 531 U.S. 98, 105 (2000) (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)). But assuming without deciding that constitutional violations did occur, these violations did not change the result of the election and were therefore harmless. Westlake argues that discounting votes from Shungnak would disenfranchise Alaska Native voters and violate the Voting Rights Act, 52 U.S.C. §§ 10101, 10301 (2012). According to the 2010 census, Shungnak is 94.3% American Indian or Alaska Native. U.S. Census Bureau, *Race and Hispanic or Latino Origin*, AMERICAN FACTFINDER, https://factfinder.census.gov/bkmk/table/1.0/en/DEC/ 10_SF1/QTP3/1600000US0270100 (last visited July 12, 2018). Because we do not discount votes from Shungnak, we do not consider the implications of the Voting Rights Act.

Shungnak was sufficient to change the result of the election. We therefore REVERSE the superior court's order proportionately reducing the vote total in Shungnak. We agree with the Director's certification of the vote in Shungnak. We AFFIRM the Director's certification with respect to Shungnak.

It was error for the Director to count the two questioned ballots in Kivalina. We REVERSE this decision. It was also error for the superior court to order that those votes be deducted under the election contest statute. But the result of that order — not counting the questioned ballots — is correct. We therefore AFFIRM the superior court's order reducing one vote from each candidate in Kivalina.

We AFFIRM the decisions of both the Director and the superior court on all other issues. The Director shall certify Westlake as the winner of the election with 824 votes to Nageak's 816 votes.

WINFREE, Justice, dissenting in part.

I respectfully dissent from that part of the court's opinion reversing the trial court's determination that the election officials' malconduct could have changed the election result. The court subtly changes the standard used in past cases to assess whether malconduct affected the election, deciding that Nageak was required to show not just that the malconduct *could* have changed the result — the standard applied in other cases[1] — but that it *would* have changed the result. Additionally the court decides as a matter of law that the expert opinion the trial court found more credible and relied on in making its findings actually was less credible than the expert opinion the trial court rejected. But when an election contest decision is reviewed after a full trial, rather than, say, a summary judgment decision,[2] the findings of fact and conclusions of law were made by a trial court with the same power to assess credibility and weigh evidence that trial courts possess in all cases, and the same standards of review should be used and the same deference shown to a trial court as in other cases with contested factual disputes. Because the court seems unable or unwilling to say that the trial court's factual findings, including its credibility finding, were clearly erroneous, the trial court should be affirmed, although the election should be declared void and a new election ordered.

I agree with the court that, consistent with the framework in *Hammond v. Hickel*, the malconduct in Shungnak had "a random impact on votes" but the affected votes cannot be segregated.[3] Under the *Hammond* framework, to determine whether this

---

[1] *Hammond v. Hickel*, 588 P.2d 256, 259 n.5 (Alaska 1978) (quoting *Boucher v. Bomhoff*, 495 P.2d 77, 80 n.5 (Alaska 1972)).

[2] *Cf. id.* at 258 (indicating appeal was from cross-motions for summary judgment).

[3] *Id.* at 260.

type of malconduct could have affected the election result, "the contaminated votes must be deducted from the vote totals of each candidate in proportion to the votes received by each candidate in the precinct or district where the contaminated votes were cast."[4] The difficult question facing the trial court after its finding of malconduct was how to calculate the number of votes to be deducted from each candidate's total to determine whether the malconduct could have changed the election's result.

The election in this case presented a novel situation because the malconduct entailed distribution of two ballots, affecting two different primary elections rather than one election with two candidates or a proposition. To know with any certainty how the malconduct affected the ADL primary — the election Nageak was contesting — required consideration of both the number of voters who may have chosen the ADL ballot and the number of voters choosing the ADL ballot who may have voted for each candidate. Prior cases have never needed to determine how many voters *might* have voted in a particular election; they needed only to apply a proportional reduction to the actual number of ballots cast.[5] Because of these complications, and because the malconduct affected all of the votes in Shungnak, a separate precinct within District 40, the trial court was not faced with a simple math problem.

The court today frames the question on review as "whether Nageak has shown that [the] malconduct was 'sufficient to change the result of the election,' " citing

---

[4] *Id.*

[5] *See, e.g., id.* at 272-73 (setting out formula to recalculate vote totals in order that general election can proceed); *see also Finkelstein v. Stout*, 774 P.2d 786, 793 (Alaska 1989) (applying proportional reduction in recount appeal); *Fischer v. Stout*, 741 P.2d 217, 225-26 (Alaska 1987) (rejecting recount challenge after determining that pro rata reduction did not change election result).

AS 15.20.540(1).[6] The court discusses the likelihood "that almost all of the[] voters still *would have* voted the ADL ballot" and posits that "the error of election officials in Shungnak was harmless unless at least 8 of the 47 voters who voted for Westlake *would have* chosen the Republican ballot."[7] *Boucher v. Bomhoff* interpreted AS 15.20.540 and prior case law as placing on a party challenging an election "the burden of proving that the alleged misconduct *could have changed* the result of the election."[8] The two words — "would" and "could" — have different meanings, with "could" "indicat[ing] possibility"[9] and "would" "indicating the *consequence* of an imagined event or situation."[10] In other words, by changing the standard from "could" to "would," the court puts a greater burden on parties bringing election contests and opens the possibility that in future election contests the parties will have to meet something approaching a "more likely than not" standard. This standard is too high: even a probability of less than 50% should be adequate to meet the purpose of an election contest, "establish[ing] doubt as to the validity of [an] election result" because of improprieties.[11]

Under either standard the trial court was required to determine how many voters would have voted in the Republican primary but for the election officials' malconduct. To assist the trial court in making necessary findings, both candidates

---

[6]    Op. at 30.

[7]    Op. at 32-33 (emphasis added).

[8]    495 P.2d at 80 n.5 (emphasis added).

[9]    *Could*, Definition 1, Oxford English Dictionaries: English, https://en. oxforddictionaries.com/definition/could (last visited Mar. 15, 2018).

[10]    *Would*, Definition 2, Oxford English Dictionaries: English (emphasis added), https://en.oxforddictionaries.com/definition/would (last visited Mar. 15, 2018).

[11]    *Braun v. Denali Borough*, 193 P.3d 719, 731-32 (Alaska 2008).

offered expert witnesses. Randall Ruedrich — Nageak's expert — was qualified as an expert in "[i]rregularities in election handling" (over the State's objection) and "evaluation of voter turnout data in order to determine the impact of such irregularities." John Henry Heckendorn — Westlake's expert — was qualified as an expert in analysis of "voter patterns" in House District 40, evidently without objection. Neither expert indicated he had any special training or expertise in statistics or applied mathematics. Instead, both experts testified based on their experiences from political campaigns. The experts offered differing analyses and conclusions, and the trial court found Ruedrich's "testimony more authoritative and reliable." Based on this credibility finding, the trial court used Ruedrich's calculation and made a factual finding of the number of voters who would have selected the Republican ballot without the malconduct; it then used the *Hammond* framework to reduce the two candidates' vote totals proportionately. This method led to the conclusion that the malconduct could have changed the election result.

On appeal, the court reviews Ruedrich's method de novo and concludes it "does not take into account" certain factors that the court decides are "legally significant."[12] The court does not articulate a standard of general applicability for all election contests and gives no guidance to trial courts about what factors it might consider "legally significant" in other primary or general elections.[13] Instead, the court: (1) holds that it was "legal error for the superior court to adopt Ruedrich's method";[14] (2) "agrees" with "Heckendorn's method of analysis," even though it criticizes some

---

[12] Op. at 35 & note 87.

[13] Op. at 35.

[14] Op. at 35.

aspects of his calculations;[15] and (3) "do[es] not hold that Heckendorn's method is the only or best method."[16] If there were a clearly articulated formula about how to calculate the impact of malconduct in election contests, an expert's deviation from that rule might be legally erroneous. But there is no such rule, and the court does not announce one today. The court is either reweighing the expert testimony and affording more weight to Heckendorn than to Ruedrich, or it is conducting a trial de novo on the record and simply rejecting what it dislikes as "legally invalid."[17] This is a clear departure from the customary review of trial court decisions.

An expert must be qualified "by knowledge, skill, experience, training, or education" when "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."[18] Trial courts are generally accorded discretion in determining whether to admit non-scientific expert testimony,[19] and "[t]he weight to be given to expert testimony is within the province of the trier of fact."[20] While the experts in this case may not have used detailed statistical analyses — and, indeed, were not qualified to do so — they offered opinions in their areas of expertise that the trial court was entitled to evaluate for credibility and weight.

---

[15]    Op. at 37.

[16]    Op. at 37.

[17]    *Cf.* Op. at 37.

[18]    Alaska R. Evid. 702(a).

[19]    *Marron v. Stromstad*, 123 P.3d 992, 998 (Alaska 2005).

[20]    *State v. Phillips*, 470 P.2d 266, 272 (Alaska 1970).

Given these liberal admissibility standard for expert testimony,[21] the trial court's decision to accept and evaluate the expert testimony here was not an abuse of discretion. And in light of the nature of the expert testimony the parties presented, I cannot conclude that the trial court's finding that Ruedrich's opinion was "more authoritative and reliable" was clearly erroneous. The court certainly is unable, or unwilling, to do so. It instead conjures heretofore unknown ad hoc legal requirements invalidating Reudrich's opinion.

The result of today's opinion is to make election contests more difficult for both the parties and the trial court. A showing that malconduct would affect the result is stricter than a showing that it could affect the result. And because the court does not set out specific guidelines for parties or trial courts to use in future election cases, participants in those cases cannot know what new ad hoc factors this court may decide in the future are "legally significant," injecting a great amount of uncertainty into a process that usually proceeds in a highly expedited fashion. I would adhere to our precedent and our customary standard of review and would affirm the trial court's malconduct determination, although I would remand for a new primary election. I respectfully dissent from that part of the court's opinion holding otherwise.

---

[21] *Marron*, 123 P.3d at 1002 (explaining "our 'liberal admissibility standard' for expert testimony allows any person with specialized knowledge to serve as an expert witness . . . . [n]o specific training or formal education is required" (quoting *John's Heating Serv. v. Lamb*, 46 P.3d 1024, 1034 (Alaska 2002))).

# In the Supreme Court of the State of Alaska

|  |  |
|---|---|
| In the Matter of the | )  Supreme Court Nos. **S-16462,** |
|  | )        S-16492, and S-16494 |
|  | )            (consolidated) |
| **2016 State House District 40** | ) |
| **Primary Election** | )        **Order** |
|  | ) |
|  | ) |
|  | )  Date of Order: **10/12/16** |
| Division of Elections Recount; | |
| 3AN-16-09015CI | |

Before:    Stowers, Chief Justice, and Winfree, Maassen, Bolger, and Carney, Justices

Before the court are consolidated appeals: S-16462 is an election recount appeal from the August 16, 2016 primary election, filed by Benjamin N. Nageak; S-16492 is Lt. Governor Byron Mallott's appeal from the superior court's Findings of Fact and Conclusions of Law dated October 6, 2016 (Decision and Order) following its trial on Mr. Nageak's election contest action also arising from the August 16 primary; S-16494 is Dean Westlake's appeal from the superior court's Decision and Order in the election contest case. This court has considered the briefs of the parties and the record from the superior court, and conducted oral argument on October 12, 2016.

**IT IS ORDERED** that the superior court's Decision and Order to the Division of Elections to retabulate the vote total from the Shungnak precinct and certify Mr. Nageak as the winner of the Democratic primary in House District 40 is **REVERSED**. The Division of Elections' certification of Mr. Westlake as the winner of the House District 40 Democratic primary is **REINSTATED**. The superior court's Decision and Order is otherwise **AFFIRMED**.[*]

---

[*]This affirmance includes the superior court's Decision and Order concluding that the Division of Elections Director's determination to count seven questioned ballots in Kivalina was erroneous. The superior court correctly ordered that the seven questioned ballots must be disregarded; because two of the questioned ballots were on the combined Alaska Independent-Democrat-Libertarian ballot with one vote for each candidate, the superior court also correctly directed the Director to deduct one vote from each candidate.

A written opinion explaining this court's Order will be forthcoming.

Entered at the direction of the court.

Clerk of the Appellate Courts


/s/Marilyn May

WINFREE, Justice, concurring in part and dissenting in part.

I agree with the court that — as Mr. Nageak's counsel conceded during oral argument — the superior court's order directing the Division of Elections to certify Mr. Nageak as the winner of the Alaska Democratic Party primary election in House District 40 was legal error and must be reversed. But in my view the superior court correctly determined that — as to the primary election in the Shungnak precinct — the Division of Elections committed malconduct that could have affected the election result between Mr. Nageak and Mr. Westlake. Accordingly I would declare the election void and direct the Division of Elections to hold a new election.

# House District 40

## Redistricting Plan July 14, 2013



Chukchi Sea

Beaufort Sea

40-024 Kotzebue

40-032 Point Hope

40-020 Kivalina

40-014 Deering

40-026 Noatak

40-034 Point Lay

40-040 Wainwright

40-008 Barrow

40-012 Buckland

40-028 Noorvik

Northwest Arctic Borough

40-018 Kiana

40-006 Atqasuk

40-010 Browerville

40-036 Selawik

40-038 Shungnak

40-002 Ambler

North Slope Borough

40-030 Nuiqsut

40-022 Kobuk

40-326 Allakaket

40-330 Hughes

40-328 Bettles

40-004 Anaktuvuk Pass

40-016 Kaktovik

