*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

|  |  |  |
|---|---|---|
| LANCE PRUITT, | ) | |
| | ) | Supreme Court No. S-17971 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-20-09661 CI |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA, OFFICE OF | ) | |
| LIEUTENANT GOVERNOR, and | ) | No. 7565 – November 12, 2021 |
| KEVIN MEYER, in an official | ) | |
| capacity; DIVISION OF ELECTIONS, | ) | |
| and GAIL FENUMIAI, in an official | ) | |
| capacity. | ) | |
| | ) | |
| Appellees, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ELIZABETH A. HODGES SNYDER, | ) | |
| | ) | |
| Intervenor. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Josie Garton, Judge.

Appearances: Stacey C. Stone, Holmes Weddle & Barcott, P.C., Anchorage, for Appellant. Laura Fox, Thomas S. Flynn, Margaret Paton Walsh, Assistant Attorneys General, Anchorage, and Clyde "Ed" Sniffen, Jr., Acting Attorney General, Juneau, for Appellees. Holly C. Wells and Jennifer C. Alexander, Birch Horton Bittner & Cherot, Anchorage, for Intervenor.

Before: Bolger, Chief Justice, Winfree, Maassen, Carney, and Borghesan, Justices.

BORGHESAN, Justice.

## I. INTRODUCTION

After a narrow loss in the general election for Alaska House District 27, Lance Pruitt brought an election contest challenging the result. The superior court dismissed Pruitt's multi-count complaint for failure to state a valid claim. But in order to expedite the case's eventual review, the court heard evidence on a single count:[1] Pruitt's claim that the Division of Elections committed malconduct that influenced the election by moving a polling place without notifying the public in all the ways required by law. After considering the evidence, the superior court ruled that Pruitt did not show either that the lack of notice amounted to malconduct or that it was sufficient to change the results of the election. Pruitt appealed only the count on which the court heard evidence. In order to resolve this election contest before the start of the legislative session, we issued a brief order stating that Pruitt had not met his burden to sustain an election contest. This opinion explains our reasoning. Although the count alleging inadequate notice should not have been dismissed for failure to state a claim, it does not succeed on the merits. We therefore affirm the superior court's judgment.

## II. FACTS AND PROCEEDINGS

Incumbent Lance Pruitt and challenger Elizabeth Snyder ran in the November 3, 2020 general election to represent House District 27. On November 30 the

---

[1] Given the expedited timeline of this case, we commend the superior court for its foresight in taking evidence in the alternative to ensure this case could be swiftly resolved.

Division of Elections certified Snyder as the winning candidate by a margin of 13 votes. A recount on December 4 narrowed Snyder's margin of victory to 11 votes.

## A. Initial Proceedings

On December 9 Pruitt and six other plaintiffs filed a complaint against the Director of the State's Division of Elections and Lieutenant Governor Kevin Meyer (collectively "the Division").[2] The plaintiffs contested the election under AS 15.20.540, alleging that the "integrity of the election [was] in question" because the Division had failed to develop a procedure to review ballot signatures and to give required notice after moving a polling place in House District 27. They also alleged violations of the federal Equal Protection Clause. In the following days Snyder intervened in the lawsuit, and all plaintiffs except Pruitt were dismissed. On December 14 Pruitt filed an amended complaint adding a new allegation: that several voters cast ballots in House District 27 without meeting the legal requirement that they reside in that district for at least thirty days before the election.

Both Snyder and the Division moved to dismiss Pruitt's complaint. On December 22 the superior court granted the motion to dismiss on all counts. It also dismissed Pruitt's December 14 amended complaint as untimely. But in light of the short time frame for resolving the election contest, the court opted to take testimony on Count

---

[2]     After the December 4 recount, a group of Pruitt's supporters also filed a recount appeal with this court. *See Nageak v. Mallott*, 426 P.3d 930, 940 (Alaska 2018) (contrasting an election contest and a recount appeal). We appointed a special master to preside over the recount appeal and indicated that the appeal would be consolidated with this election contest. The special master found that all ballots challenged in the recount appeal had been properly counted or rejected. Pruitt and the recount appeal plaintiffs then dismissed "that portion of the appeal relating to the recount appeal," so that "the only appeal to proceed shall be that of the election contest."

II, explaining that this count had been dismissed "because of what [the court] would describe as a pleading error."

Count II of Pruitt's complaint[3] alleged that the Division had violated AS 15.10.090, which sets forth how the Division must notify the public when a polling place is changed. The polling place for House District 27 Precinct 915, or "27-915," was changed twice in 2020, the second time shortly before the general election. Count II asserted that the Division failed to provide the required notice of this second change.

**B.      Hearing On Pruitt's Claim Related To Inadequate Notice**

At a hearing on December 22 and 23, the superior court took evidence about the two polling place changes. The polling place was first changed in August 2020 — prior to the 2020 primary election — from Wayland Baptist University to Muldoon Town Center. It was then changed in October 2020 — prior to the 2020 general election — from Muldoon Town Center to Begich Middle School.

A precinct chairperson for 27-915[4] testified that he went to Wayland Baptist University the day before the August 18 primary election to make sure that the booths were properly set up. He was met at the door by a university employee and asked several questions regarding his COVID-19 exposure. The chairperson testified that this "raised a couple red flags for [him] on whether all of the election voters were going to have to

---

       [3]      Because Count II is identical in Pruitt's initial and amended complaints, it is irrelevant whether the amendment was properly denied as untimely, and Pruitt does not challenge that ruling on appeal.

       [4]      A chairperson or co-chairperson is a poll worker who is responsible for "oversee[ing] the Election Day Operations at an assigned polling place." Poll workers are nonpartisan employees of the State of Alaska. *Polling Place Workers*, ALASKA DIVISION OF ELECTIONS, http://elections.alaska.gov/Core/workers_poll.php (last visited August 19, 2021).

undergo the same rigorous screening procedures." He called the election field office and voiced his concerns.

Julie Husmann, the Region 2 Elections Supervisor, received the call. She decided to move the polling place to Muldoon Town Center because it was the "closest polling place available . . . that would be able to handle . . . the voter turnout." In order to notify voters about the change in polling place, Husmann had a poster made up and gave it to a field worker. She testified that no other notice was provided of the polling place change, noting that "[i]t was very quick, a lot going on."

After the primary election, the Division of Elections assumed that Muldoon Town Center would be the 27-915 polling place for the 2020 general election. Around October 22, Husmann contacted Muldoon Town Center to verify that it would again be available as a polling place. The owner of the Muldoon Town Center indicated that he did not want the center to serve as the polling place for 27-915.

Husmann testified that immediately after learning Muldoon Town Center was no longer available, she contacted the Anchorage School District. The district had previously offered to make its schools available as polling places. On October 22 Husmann sent the school district a formal letter asking to use Begich Middle School as the polling place for 27-915. The district replied that the request had been tentatively approved subject to formal approval by the school's principal. Formal approval was received on October 26, and Begich Middle School was confirmed as the polling place location on October 27.

Witnesses from the Division testified about the efforts they made to provide public notice of the change. Alaska Statute 15.10.090 requires that the Division provide public notice of a polling place change by: (1) sending written notice to each voter in the precinct "whenever possible"; (2) publishing notice in a local newspaper; (3) posting the change on the Division's website; (4) notifying relevant municipal clerks, community

councils, and tribal entities; and (5) noting the change in the official election pamphlet. Division Director Gail Fenumiai testified that with the late change, there was not enough time to mail notice to voters, publish notice in the official election pamphlet (which had already been mailed to voters), or place an ad in the newspaper. Husmann testified that the Division updated its website and polling place locator hotline to reflect the new polling place, and put up posters and A-frame signs at the old and new polling places to guide voters to the correct polling place. However, the Division did not notify the Anchorage municipal clerk of the change.

Pruitt called a witness to show that at least one voter was frustrated by the polling place change and ultimately did not vote. Mary Jo Cunniff, a realtor from Anchorage, testified that on the day of the general election she left her home at "about 8:20, 8:30" in the morning to go to Wayland Baptist University to vote. When she got there, she saw a sign telling her to go to Begich Middle School to vote instead. Cunniff testified that she was "kind of mad" because she had planned her day around voting and because "there had been nothing in the news" about the polling place change. By the time she got to Begich, between 8:30 and 8:45, "many, many, many people were there." Cunniff testified that she knew she'd "never make" her 10:00 appointment if she stayed to vote, so she left without voting. She then had back-to-back appointments for the rest of the day and ultimately did not vote. A 27-915 precinct co-chair testified that election day voters at Begich Middle School were confused by the change.

Finally, Pruitt presented the testimony of an expert witness, Randolph Ruedrich. Ruedrich opined that, based on his modeling of registration and turnout statistics in precinct 27-915 and neighboring precincts, the Division's actions were sufficient to change the result of the election. The Division presented its own expert, Ralph Townsend, who opined that Ruedrich's analysis was flawed in several ways.

## C.    Superior Court's Decision

On December 29 the superior court issued findings of fact and conclusions of law regarding Count II. It held that the Division did not fully comply with AS 15.10.090, but that this failure did not amount to malconduct because it "did not significantly frustrate the purpose of the statute, full compliance was impossible, [the Division] partially complied by posting notice on its website, and it took other steps to notify affected voters by posting signs at the old polling places, and had accurate information available" on the hotline. It further concluded that Pruitt had failed to meet his burden to show that any malconduct was sufficient to change the results of the election. Pruitt's expert's testimony had relied on the assumption that lower turnout in 27-915 than in two neighboring districts reflected an undervote, but the court found this assumption flawed. And the court found that Pruitt's expert had assumed his conclusions, namely that all three districts should have the same turnout and that any difference in turnout between 27-915 and the other two districts was caused by the change in polling place.

On December 30 Pruitt appealed, challenging the superior court's rulings on Count II only.

## III.    STANDARDS OF REVIEW

We review de novo the dismissal of a complaint under Alaska Civil Rule 12(b)(6), "deeming all facts in the complaint true and provable."[5]  To survive such a motion, "it is enough that the complaint set forth allegations of fact consistent with and appropriate to some enforceable cause of action."[6]  "[A] complaint should not be

---

[5]    *Guerrero v. Alaska Hous. Fin. Corp.*, 6 P.3d 250, 253 (Alaska 2000) (footnote omitted).

[6]    *Caudle v. Mendel*, 994 P.2d 372, 374 (Alaska 1999) (quoting *Kollodge v.* (continued...)

dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[7]

"Whether the conduct of election officials constitutes malconduct and whether that malconduct was sufficient to change the result of an election are questions of law."[8]   We "review questions of law de novo, 'adopting the rule of law most persuasive in light of precedent, reason, and policy.' "[9]  Underlying findings of fact are reviewed for clear error, which exists when our "review of the record leaves us with the definite and firm conviction that the superior court has made a mistake."[10]

## IV.   DISCUSSION

### A.   It Was Error To Dismiss Count II Of The Complaint For Failure To State A Claim For Which Relief May Be Granted.

Alaska law allows a losing candidate to contest the outcome of an election by proving "malconduct, fraud, or corruption on the part of an election official sufficient to change the result of the election."[11]  If the challenger makes this showing, the superior court must "pronounce judgment on which candidate was elected or nominated" or, if

---

[6]      (...continued)
*State*, 757 P.2d 1024, 1025-26 (Alaska 1988)).

[7]      *Guerrero*, 6 P.3d at 254 (emphasis omitted) (quoting *Martin v. Mears*, 602 P.2d 421, 429 (Alaska 1979)).

[8]      *Nageak v. Mallott*, 426 P.3d 930, 940 (Alaska 2018).

[9]      *Id.* (quoting *Comsult LLC v. Girdwood Mining Co.*, 397 P.3d 318, 320 (Alaska 2017)).

[10]      *Id.* (quoting *Ranes & Shine, LLC v. MacDonald Miller Alaska, Inc.*, 355 P.3d 503, 508 (Alaska 2015)).

[11]      AS 15.20.540(1).

it decides "that no candidate was duly elected or nominated," order that "the contested election be set aside."[12]

The mere fact that an election law has been violated does not amount to malconduct. Rather, proving "malconduct" requires showing "a significant deviation from statutorily or constitutionally prescribed norms."[13] In addition, the election contestant typically must show that this deviation from the law either introduced bias into the vote or was committed with scienter.[14] "Bias exists at the malconduct stage when conduct of election officials influences voters to vote a certain way."[15] By contrast, conduct that "impact[s] randomly on voter behavior" will constitute malconduct if it is "imbued with scienter, a knowing noncompliance with the law or a reckless indifference to norms established by law."[16] Even if no individual violation constitutes malconduct, this court has acknowledged the possibility that "an election will be so permeated with numerous serious violations of law, not individually amounting to malconduct, that substantial doubt will be cast on the outcome of the vote," in which case "cumulation of irregularities may be proper and will support a finding of malconduct."[17]

---

[12]    AS 15.20.560.

[13]    *Hammond v. Hickel*, 588 P.2d 256, 258 (Alaska 1978).

[14]    *See Nageak*, 426 P.3d at 945 n.60.  Although we have "never held that a deviation was significant enough from the norm to constitute malconduct absent scienter or bias," we have "not foreclosed the possibility of demonstrating malconduct by showing good faith maladministration." *Id.*

[15]    *Id.*

[16]    *Hammond*, 588 P.2d at 259.

[17]    *Id*.

The superior court dismissed Count II of Pruitt's complaint for failure to state a claim upon which relief could be granted[18] because Pruitt did not allege that the Division's failure to provide the statutorily required notice introduced bias or was committed with scienter. The superior court stated that election contestants "must strictly comply with the statutory requirements," citing *Dale v. Greater Anchorage Area Borough*.[19] But neither *Dale* nor any of our other cases creates a heightened pleading standard in election contests, and Count II of Pruitt's complaint survives dismissal under the ordinary standard for Rule 12(b)(6). The Division argues that we may affirm dismissal on the alternative theory that the Division did not violate AS 15.10.090 at all because it applies only to permanent, rather than temporary, polling place changes. Because that interpretation is not supported by the statutory text or legislative history, we do not affirm on that ground.

### 1. There is no heightened standard of pleading for election contests.

There is no statute, court rule,[20] or precedent requiring special particularity in pleading election contest claims, and we decline to create such a rule now. Rather, these claims are subject to the usual standard, under which motions to dismiss are "viewed with disfavor and should only be granted on the rare occasion where 'it appears beyond doubt that the plaintiff can prove no set of facts in support of the claims that would entitle the plaintiff to relief.' "[21]

---

[18] *See* Alaska R. Civ. P. 12(b)(6).

[19] 439 P.2d 790 (Alaska 1968).

[20] *Cf.* Alaska R. Civ. P. 9 (requiring certain matters, such as fraud, to be pled with particularity).

[21] *Jacob v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 177
(continued...)

In dismissing Count II for failure to state a claim, the superior court cited *Dale*, in which we stated that "the failure of a contestant to observe strict compliance with the statutory requirements is fatal to his right to have an election contested."[22] But *Dale* does not establish a higher pleading standard in election cases. In that case a plaintiff bringing an election contest claim failed to follow a statutory requirement that she deliver written notice of her election contest to the borough assembly.[23] We held that "[c]ompliance with this requirement of the ordinance was a condition precedent to [the plaintiff's] invoking the power of the court to have the election declared invalid"; because the plaintiff had failed to meet this condition, "her complaint failed to state a claim upon which relief could be granted."[24] *Dale* stands for the proposition that plaintiffs must comply with any statutory conditions precedent before bringing an election contest claim, but it does not require plaintiffs to plead election contest claims with a higher degree of specificity.

The superior court reasoned that a plaintiff must plead detailed allegations so the Division can respond within the short deadline typical of an election contest. But the expedited nature of election contests cuts both ways.[25] A plaintiff may know that a

---

[21] (...continued) P.3d 1181, 1184 (Alaska 2008) (quoting *Lowell v. Hayes*, 117 P.3d 745, 750 (Alaska 2005)).

[22] 439 P.2d at 792 (holding that election contestant who failed to comply with condition precedent to bringing election contest failed to state claim upon which relief could be granted).

[23] *Id.* at 792-93.

[24] *Id.* at 793.

[25] *See* AS 15.20.550 (permitting a plaintiff to bring an election contest "in the
(continued...)

law has been violated but lack time to gather evidence of bias or scienter, which will often be under the defendants' control when the suit is brought. Requiring plaintiffs to plead with greater-than-normal particularity could block potentially meritorious election contests. We therefore decline to establish a heightened pleading standard based on election contests' expedited nature.

### 2. The language of the complaint sufficiently states an election contest claim.

Although Pruitt's complaint does not use the term "malconduct," Count II clearly describes an election contest claim. The complaint invoked AS 15.20.550, the jurisdiction statute for election contests, and explained that the plaintiffs were qualified under AS 15.20.540, which establishes the statutory grounds for election contests. It claimed that "there were several errors in the conduct of the election sufficient to change the outcome of the election." And its description of the Division's failure to provide the required notice alleged facts that, if true, could support a finding of malconduct sufficient to change the result of the election.

Pruitt's failure to use the word "malconduct" is not fatal. Whether behavior constitutes malconduct is a question of law.[26] Because "conclusions of law are not considered admitted in resolving" Rule 12(b)(6) motions,[27] it would be incongruous to require plaintiffs to include a legal conclusion in order to avoid dismissal under

---

[25]    (...continued)
superior court within 10 days after the completion of the state review").

[26]    *Nageak v. Mallott*, 426 P.3d 930, 940 (Alaska 2018).

[27]    *Dworkin v. First Nat'l Bank of Fairbanks*, 444 P.2d 777, 779 (Alaska 1968); *accord Haines v. Comfort Keepers, Inc.*, 393 P.3d 422, 429 (Alaska 2017) ("[E]ven on a motion to dismiss, a court is not obliged to accept as true '. . . conclusions of law.' " (quoting *Dworkin*, 444 P.2d at 779)).

Rule 12(b)(6). For this same reason we reject the Division's argument that Pruitt failed to state a claim because he did not specifically allege a "significant deviation" from statutory norms; this too is a legal conclusion.[28]

Nor is it even necessary to allege malconduct in order to state an election contest claim under AS 15.20.540. We have recognized that a plaintiff may bring a successful election contest claim by alleging an election "so permeated with numerous serious violations of law, not individually amounting to malconduct, that substantial doubt will be cast on the outcome of the vote."[29] A rule requiring plaintiffs to specifically allege malconduct to survive Rule 12(b)(6) dismissal would eliminate this possibility.

It is true that different kinds of malconduct exist and that Pruitt's complaint fails to specify which kind is alleged here. But given the disfavor with which we treat dismissal under Rule 12(b)(6), we decline to require plaintiffs to allege a specific type of malconduct in order to survive. It is difficult for a plaintiff to obtain evidence of scienter, for example, within the compressed timeline of an election contest claim. A plaintiff who knows that an election norm has been violated but does not yet have access to the defendant's mental state may need to bring an election contest claim before knowing if the alleged malconduct was committed with or without scienter.

Snyder suggests that *Miller v. Treadwell* supports dismissal, but that is not so. In *Miller* we remanded a defeated candidate's lawsuit (which was not framed as a recount appeal or an election contest) to the superior court to decide whether the candidate should be allowed to amend his complaint to allege improper voting by

---

[28]     *Nageak*, 426 P.3d at 940.

[29]     *Hammond v. Hickel*, 588 P.2d 256, 259 (Alaska 1978).

-13-                                    7565

persons convicted of a felony.[30] In doing so, we noted that if the candidate were to pursue this claim, "he must do so as an election contest under AS 15.20.540. He must allege *and prove* the necessary elements of an election contest claim, including the level of misconduct necessary to support the claim and that the votes in question are sufficient to change the result of the election."[31] This statement does not establish a standard for the sufficiency of pleading an election contest claim. It merely restates the plaintiff's burden in an election contest: the plaintiff must show that the defendants' behavior is a serious deviation from the norm and sufficient to change the result of the election.

For these reasons Pruitt's complaint, construed in the light most favorable to him as the non-moving party,[32] sufficiently states a claim on which relief may be granted.

### 3. We cannot affirm on the alternative ground that statutory notice requirements do not apply to temporary or last-minute polling place changes.

The Division argues that we may affirm dismissal of Count II on the alternative ground that AS 15.10.090 does not apply to "temporary, last-minute changes" at all, so the Division was not obliged to provide notice when moving the polling place in 27-915. But neither the statutory text nor legislative history reveals an intent to excuse the Division from notifying the public of temporary or last-minute polling place changes — an exemption that would be contrary to the overall purpose of the statute.

---

[30] 245 P.3d 867, 874, 876-77 (Alaska 2010) (observing that "the legislature has created two specific legal proceedings for election challenges" — "an election contest and a recount appeal" — and that the candidate could not "avoid the avenues established by the legislature to challenge elections").

[31] *Id.* at 877 (emphasis added).

[32] *See Cornelison v. TIG Ins.*, 376 P.3d 1255, 1267 (Alaska 2016).

When construing statutes "we consider three factors: 'the language of the statute, the legislative history, and the legislative purpose behind the statute.' "[33] Under our sliding scale approach to statutory interpretation, "[t]he plainer the language of the statute, the more convincing contrary legislative history must be."[34]

"Interpretation of a statute begins with its text."[35] The text of AS 15.10.090 reads as follows:

> The director shall give full public notice if a precinct is established or abolished, if the boundaries of a precinct are designated, abolished, or modified, or if the location of a polling place is changed. Public notice must include
>
> (1) whenever possible, sending written notice of the change to each affected registered voter in the precinct;
>
> (2) providing notice of the change
>
> (A) by publication once in a local newspaper of general circulation in the precinct; or
>
> (B) if there is not a local newspaper of general circulation in the precinct, by posting written notice in three conspicuous places as close to the precinct as possible; at least one posting location must be in the precinct;
>
> (3) posting notice of the change on the Internet website of the division of elections;
>
> (4) providing notification of the change to the appropriate municipal clerks, community councils, tribal groups, Native

---

[33] *City of Valdez v. State*, 372 P.3d 240, 248 (Alaska 2016) (quoting *Oels v. Anchorage Police Dep't Emps. Ass'n*, 279 P.3d 589, 595 (Alaska 2012)).

[34] *Marathon Oil Co. v. State, Dep't of Nat. Res.*, 254 P.3d 1078, 1082 (Alaska 2011).

[35] *In re Paige M.*, 433 P.3d 1182, 1186 (Alaska 2018) (quoting *City of Valdez*, 372 P.3d at 249).

villages, and village regional corporations established under 43 U.S.C. 1606 (Alaska Native Claims Settlement Act); and

(5) inclusion in the official election pamphlet.

The statute straightforwardly says that the Division "shall give full public notice . . . if the location of a polling place is changed." The text makes no distinction between "permanent" and "temporary" or "emergency" polling place changes.

Uncertainty about whether this otherwise plain command applies to last-minute changes stems from the fact that it may not be possible to provide each type of notice in the event of a change shortly before the election. Subsection (1) requires the Division to send written notice of a change to voters "whenever possible." At first blush it seems incongruous that the other subsections do not make similar allowance for impossibility. But the caveat in subsection (1) may refer not to timing but to the fact that not all registered voters may be reached by mail.[36] If that is so, then none of the five notice requirements expressly account for impossibility due to last-minute polling place changes. The Division argues this omission reflects an intent to exclude last-minute changes from the statutory notice requirements altogether.[37] But absent an express exemption for last-minute changes, the statutory command to give "full public notice . . .

---

[36]     To register to vote, a person must supply the person's "Alaska residence address." AS 15.07.060(a)(4). But we have observed that a place of residence "need not have mail service" and may be "a hotel, shelter for the homeless, or even a park bench." *Fischer v. Stout*, 741 P.2d 217, 221 (Alaska 1987).

[37]     Although the Division's argument lumps together "temporary" and "emergency" polling place changes, these are not the same thing. A change in response to an emergency may be a permanent change; a temporary change may be planned long in advance. So the fact that it might be impossible to provide much notice of an emergency change is scant reason to think that the legislature intended to exempt all non-permanent changes from all notice requirements.

if the location of a polling place is changed"[38] seems equally susceptible to the inference that the legislature intended the Division to provide the required types of notice for all changes when feasible to do so. Faced with the choice of which implied caveat to read into the statute — either it exempts late changes entirely or merely exempts the Division from doing the impossible — we find the latter more consistent with the overall statutory purpose of notifying voters of polling place changes.[39]

The legislative history does suggest that the legislature was not specifically targeting last-minute changes when it drafted the notice statute. For example, testimony from the then-Director of the Division of Elections makes clear that the election pamphlet was expected to include only polling place changes that occurred before its publication.[40] And it indicates that the legislature expected all polling places to be printed in the newspaper on a single occasion, rather than continuous publication of each individual polling place change throughout the year.[41]

---

[38]     AS 15.10.090.

[39]     *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 63 (2012) ("A textually permissible interpretation that furthers rather than obstructs the document's purpose should be favored.").

[40]     Testimony of Laura Glaiser, Dir., Div. of Elections at 8:30-8:33, Hearing on H.B. 94 Before the H. State Affairs Comm., 24th Leg., 1st Sess. (Mar. 15, 2005), http://www.akleg.gov/basis/Meeting/Detail?Meeting=HSTA%202005-03-15%2008:3 0:47 (stating that "this amendment would allow the division to include in the official election pamphlet only those polling place changes that we know at the time"). A Division of Elections official's answers to legislative committee questions may be considered a reliable indicator of the intent behind a bill introduced at the governor's request. *See Cora G. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 461 P.3d 1265, 1280-81 (Alaska 2020) (giving weight to statements of executive branch representatives regarding meaning of legislation introduced at governor's request).

[41]     Testimony of Laura Glaser, *supra* note 40 at 8:35-8:37:30 (testifying that
(continued...)

But not specifically contemplating what notice may be required in the event of last-minute changes is different than specifically intending to exempt last-minute changes from any notice requirement. The Division has not proffered legislative history that clearly shows the latter intent. The closest it comes is a statement by the then-Division director that "the intent here is not . . . to do a notice every time we have a polling place modification, but instead to notice people [sic] of a polling place location."[42] This testimony indicates an intent that the Division would not publish a notice in the newspaper each time a polling place was changed, but would inform people of all polling place locations (changed or not) one time. But it still does not show that if a polling place were changed after that general notice was published, the legislature intended to excuse the Division from providing notice of that change to the public to the extent feasible.

In sum, the text of AS 15.10.090 requires that the Division "give full public notice . . . if the location of a polling place is changed" and makes no exception for temporary or last-minute changes. And the obvious statutory purpose of making sure voters know when their polling place changes is much more consistent with requiring the Division to notify them of a late change to the extent possible rather than with excusing the Division from notifying them even if it is entirely possible to do so. For that reason, evidence that the legislature did not specifically contemplate the problem of last-minute polling place changes does not convince us that the legislature actually intended to exempt last-minute changes from the statutory notice requirements entirely. We therefore conclude that AS 15.10.090 applies to the polling place change at issue here.

---

[41]    (...continued)
the intent was not to publish a notice in the newspaper every time a polling place was changed, but rather to publish a single notice of all polling place locations).

[42]    *Id.*

**B. The Superior Court Did Not Err In Concluding That Pruitt Failed To Meet His Burden To Prove His Election Contest Claim.**

**1. The superior court did not err in concluding that the Division did not commit malconduct.**

To prevail in his election contest, Pruitt had to first prove "malconduct . . . on the part of an election official."[43] "Malconduct" means a "significant deviation" from a legal or constitutional requirement, not just a "lack of total and exact compliance" with that requirement.[44] In addition to showing that the alleged conduct was a significant deviation, Pruitt had to prove one of three things to establish malconduct. First, he could show that the Division's violations of AS 15.10.090 introduced bias into the vote.[45] Second, he could show that the Division acted in knowing noncompliance with the law or reckless indifference to norms established by law.[46] Third, he could show malconduct caused by good faith maladministration.[47] Pruitt has pursued the first and second theories of malconduct, but not the third.[48]

---

[43] AS 15.20.540(1). Although there are other grounds for an election contest, Pruitt's allegations could support only malconduct.

[44] *Boucher v. Bomhoff*, 495 P.2d 77, 80 (Alaska 1972).

[45] *See Nageak v. Mallott*, 426 P.3d 930, 944 (Alaska 2018).

[46] *See id.*

[47] *See id.* at 945 n.60 ("[W]e . . . have not foreclosed the possibility of demonstrating malconduct by showing good faith maladministration.").

[48] A candidate may also maintain an election contest by showing that the election was "so permeated with numerous serious violations of law, not individually amounting to malconduct, that substantial doubt will be cast on the outcome of the vote." *Hammond v. Hickel*, 588 P.2d 256, 269 (Alaska 1978). But because Pruitt has abandoned on appeal his other claims of error by election officials, he cannot prevail on that theory.

The superior court concluded that Pruitt had not established malconduct. First, it held that the Division's violations of AS 15.10.090 were not "a significant deviation from constitutionally or statutorily prescribed norms."[49] Second, it did not find that any deviation from AS 15.10.090 was knowing "or done in reckless disregard of the statute's requirements." Although the superior court did not address bias in its findings of fact and conclusions of law, its order dismissing Pruitt's complaint considered and rejected his argument that the Division's violations of AS 15.10.090 introduced bias into the vote because more Republicans than Democrats vote in 27-915.

        **a.    The Division's failure to confirm the polling place location earlier cannot be the basis for malconduct absent a legal duty to confirm polling places by a certain date.**

Pruitt argues that the Division's violations of AS 15.10.090 are the result of its negligence in timely securing a polling place for 27-915. But Pruitt cites no legal authority requiring the Division to secure polling places by a certain date. Because he identifies no textual basis for this argument, we assume that he interprets AS 15.10.090 to impose an implicit duty on election officials to timely confirm all polling place locations so as to provide as many forms of required notice as possible. The Division's interpretation of AS 15.10.090, also reflected in the superior court's order, requires the Division to provide notice once a polling place is changed, but does not impose a timeline or additional duties with respect to changing the polling place itself. We conclude that AS 15.10.090 does not contain an implicit duty to timely confirm polling place locations and that the timing of the polling place change therefore does not support Pruitt's claim of malconduct.

---

    **49**    *Id.* at 258.

The statutory text — the starting point for our analysis — does not mention anything about when a polling place must be confirmed.[50] The legislature could have added language requiring the Division to verify the location of a polling place within a certain number of days before the election, but it did not do so. The absence of an express duty to confirm polling place locations by a certain date is especially significant in light of AS 15.10.080, which requires the Division to designate precinct boundaries at least 40 days before an election.[51] "[W]here certain things are designated in a statute, 'all omissions should be understood as exclusions.' "[52] Thus the statutory text alone does not impose the duty Pruitt maintains, and he does not proffer anything from the legislative history that supports interpreting the statute contrary to the plain-text reading.

Instead Pruitt advances what is essentially a policy argument. If the Division has no deadline for confirming polling places, then it could delay doing so until a day or two before the election, when very little notice would be possible. Absent a basis in text or legislative history, however, we cannot impose a duty on the Division to confirm places by a certain date simply because it might be a good idea to do so. "We are not vested with the authority to add missing terms [to a statute] or hypothesize differently worded provisions in order to reach a particular result."[53] Rather than add

---

[50] *See City of Valdez v. State*, 372 P.3d 240, 248 (Alaska 2016) ("Interpretation of a statute begins with its text.").

[51] AS 15.10.080 ("The director shall designate boundaries of an election precinct which has been established or modified, not later than 40 days before an election.").

[52] *Ranney v. Whitewater Eng'g*, 122 P.3d 214, 218 (Alaska 2005) (quoting *Croft v. Pan Alaska Trucking, Inc.*, 820 P.2d 1064, 1066 (Alaska 1991)) (describing maxim *expressio unius est exclusio alterius*).

[53] *M.M. ex rel. Kirkland v. Dep't of Admin., Off. of Pub. Advoc.*, 462 P.3d 539,
(continued...)

substantive requirements to the statute, we trust in the good faith of election officials to make sure all Alaskans are able to vote and the wisdom of the legislature in guiding these officials' behavior. Pruitt has identified no law that obliged the Division to confirm the location of the 27-915 polling place by a certain date, so the Division's failure to act sooner is not grounds for a finding of malconduct.

> **b. The superior court did not err in holding that the Division's violations of AS 15.10.090 were not a significant deviation from the law.**

"Malconduct" "means a significant deviation from statutorily or constitutionally prescribed norms,"[54] which is something "more than a lack of total and exact compliance with the constitutionally and statutorily prescribed" procedures.[55] Pruitt argues that the Division's failure to timely move the polling place "cannot be considered good faith, and is a significant deviation from the norm." But as explained above, AS 15.10.090 does not impose a duty on the Division to confirm the polling place location by a specific point in time. Rather, the key questions are whether the Division complied with AS 15.10.090 by providing all forms of notice listed under that statute that were feasible at the time of the polling place change and, if not, whether this failure was a significant deviation from the norm.

Alaska Statute 15.10.090 requires five forms of notice: (1) "whenever possible, sending written notice of the change to each affected registered voter in the precinct"; (2) notice "by publication once in a local newspaper of general circulation in the precinct"; (3) notice "on the Internet website of the division of elections"; (4) notice

---

[53]     (...continued)
547 n.37 (Alaska 2020) (alteration in original).

[54]     *Hammond*, 588 P.2d at 258.

[55]     *Boucher v. Bomhoff*, 495 P.2d 77, 80 (Alaska 1972).

"to the appropriate municipal clerks, community councils, tribal groups, Native villages, and village regional corporations"; and (5) notice in "the official election pamphlet." The superior court found that the only required notice that could reasonably have been given but was not was notifying the municipal clerk.[56] This finding is not clearly erroneous, and this single failure was not a significant deviation from the statutory norm.[57]

The Division did not send voters written notice of the move to Begich Middle School. Director of the Division of Elections Gail Fenumiai testified that there had been no time "to procure a printing company to do the mailing" and no staff available to mail out the notices. Because unrebutted testimony indicated that sending written notice would not have been possible, the Division did not violate AS 15.10.090(1) when it did not send out written notice.

The Division also did not publish notice of the move in an Anchorage newspaper as required under subpart (2). Fenumiai testified that the Division concluded "there just wasn't adequate time" to do so. Nor did it include notice of the change in the official election pamphlet as required under subpart (5); testimony indicated that the pamphlet had already been mailed out by the time of the change. The legislative history shows that the legislature did not intend the Division to accomplish the impossible feat of including in the election pamphlet notice of changes that had not occurred by the time

---

[56]    *See* AS 15.10.090(4).

[57]    Whether election officials' actions amount to a significant deviation from prescribed norms is part of the inquiry into "[w]hether the conduct of election officials constitutes malconduct," a question of law that we review de novo. *Nageak v. Mallott*, 426 P.3d 930, 940 (Alaska 2018).

the pamphlet was printed.[58] We conclude that it similarly did not intend the Division to publish notice of the change in the newspaper when doing so would be infeasible. Because unrebutted testimony established that publication in a newspaper or the election pamphlet would not have been possible, the Division did not violate subparts (2) or (5).

The Division's website was updated to reflect the move as required under subpart (3). A precinct chairperson for 27-915 testified that on the day of the general election, one page of the Division's website listed either Wayland Baptist University or Muldoon Town Center as the polling place for 27-915. However, when he clicked on that location, it "took [him] to another screen that . . . did locate Begich Middle School as being the location for 27-915." The chairperson reported the problem with the website to the Division. Although this may have been a minor mistake on the Division's part, the Division largely complied with the directive to update its website.

Finally, the Division failed to inform the Anchorage clerk of the new polling location as required under subpart (4). As the only feasible form of required notice that the Division failed to provide,[59] this is not a significant deviation from AS 15.10.090. Pruitt does not explain how notifying the municipal clerk would have affected the election or turnout. In the absence of other deviation from the statute, the Division's violation of AS 15.10.090(4) constitutes a mere "lack of total and exact

---

[58]     Testimony of Laura Glaiser, *supra* note 40 at 8:30-8:33 (stating that "this amendment would allow the division to include in the official election pamphlet only those polling place changes that we know at the time").

[59]     Pruitt argues that the Division failed to notify the election chair for the precinct until November 1, but notifying the election chair is not a statutory requirement.

compliance" with the statutory requirements, rather than a "significant deviation" from them.[60]

> ### c. The superior court did not err in rejecting Pruitt's argument that bias was introduced.

Even if Pruitt had shown that the Division's violations amounted to a significant deviation, in order to prove malconduct he would have also needed to show that they were committed with scientier or that they introduced bias into the vote.[61] Pruitt argued to the trial court that the lack of required notice introduced bias because it did not have "a random impact on voter behavior." Asserting that "Republicans outnumbered Democrats voting in [27-915] on Election Day," Pruitt argued the lack of notice "imped[ed] more Republican votes than Democrat votes" and therefore "bias was absolutely introduced." The superior court rejected this argument in its order dismissing Pruitt's complaint. Pruitt reprises this argument on appeal.

*Nageak v. Mallott* plainly forecloses this argument. In *Nageak*, the superior court "found that the election officials' actions constituted bias 'because they occurred in a precinct that lopsidedly favored [one candidate].' "[62] We held the finding erroneous because bias only "exists at the malconduct stage when conduct of election officials *influences voters to vote a certain way*."[63] Because the Division's failure to give full public notice of a polling place change does not "influence[] voters to vote a certain way," Pruitt cannot show that the Division's violation of AS 15.10.090 introduced bias into the vote.

---

[60]     *Boucher*, 495 P.2d at 80.

[61]     *See Nageak*, 426 P.3d at 944.

[62]     *Id.* at 945 n.60.

[63]     *Id.* (emphasis added).

**d.** **The superior court did not clearly err in finding that Pruitt failed to show that violations of AS 15.10.090 were imbued with scienter.**

The second way that Pruitt could show malconduct is by showing that the Division violated AS 15.10.090 with "scienter, a knowing noncompliance with the law or a reckless indifference to norms established by law."[64]

The superior court found that "[t]he Division, the Director, the Region II Supervisor, and other Division employees acted in good faith in attempting to notify affected voters about the change to the polling location." It did not find that any deviation from AS 15.10.090 was knowing "or done in reckless disregard of the statute's requirements." Because this finding is based on facts in the record, we review it for clear error,[65] and find none.

Pruitt argues that the Division "knew it had an issue with the []27-915 polling location on August 17, and . . . took no timely efforts to secure a polling place for []27-915 voters for the General Election." It claims that the Division "created a situation where it was unable to notify voters timely and in a proper fashion of the change" and that the Division's "dilatory conduct cannot be considered good faith." But this argument assumes that AS 15.10.090 includes an implicit duty to timely secure polling places. As explained above, the statute does not impose this duty on the Division. It only requires the Division to notify voters of a polling place change.

On that score, the superior court did not clearly err in finding a lack of scienter. The Division's failure to notify the Anchorage clerk — the only form of notice that it was statutorily required to give and could have given but failed to — does not

---

[64] *Hammond v. Hickel*, 588 P.2d 256, 259 (Alaska 1978).

[65] *See Nageak*, 426 P.3d at 944-45 (reviewing superior court's decision that election officials had acted with reckless disregard under clear error standard).

itself establish "knowing noncompliance" or "reckless indifference." Pruitt emphasized to the superior court that the Division failed to notify the candidates of the polling place change and failed to note the change on its Facebook page. It is true that these forms of notice might have allowed the Division to reach many more voters. But the Division's failure to provide types of notice that the statute does not require is at best weak evidence of "reckless indifference" to what the statute *does* require, particularly considering the Division's many responsibilities in the week before an election. Further, the Division did provide additional forms of notice not required by AS 15.10.090 by posting signs and updating the polling place locator hotline. These extra efforts suggest the Division was not indifferent to whether voters knew the location of their polling place. The superior court's finding that Pruitt failed to show scienter was not clearly erroneous.

**2. The superior court did not err in concluding that any malconduct was not sufficient to change the outcome of the election.**

To prevail in an election contest, the plaintiff must prove that any malconduct was "sufficient to change the result of the election."[66] Therefore Pruitt must show that the Division's failure to provide notice of the polling place change prevented enough people from voting to change the outcome. It is not enough to show that the polling place change itself caused voter confusion; the alleged malconduct is not the polling place change, but the Division's failure to provide required notice of that change. It is also not enough to show that voters in 27-915 did not know where their polling place was, as many voters in any given year may not know their polling place. Rather, Pruitt had to show that a number of voters sufficient to change the result of the election attempted to vote at the former location and were not redirected to Begich Middle School

---

[66] AS 15.20.540.

with enough time to vote before the polls closed.[67]  This burden is a heavy one, consistent with our commitment to "indulging every reasonable presumption in favor of the validity of an election."[68]  In this case the superior court found that Pruitt failed to show that "at least 11 registered voters" (Snyder's margin of victory) "were prevented from voting because they did not receive actual notice of the polling place change." Because this finding is not clearly erroneous, we agree with the court's conclusion that Pruitt did not show that the Division's failure to provide the statutorily-required notice was "sufficient to change the result of the election."[69]

Pruitt's argument rests on the testimony of his expert, Randolph Ruedrich. Ruedrich analyzed 2020 election day turnout in precincts 27-910, 27-915, and 27-920, noting that the turnout in 27-910 was 3.32% above 27-915, and that the turnout in 27-920 was 3.99% above 27-915.  Averaging these differences, he calculated that the "undervote" in 27-915 was 3.66% relative to precincts 910 and 920.  Applying this percentage to the total number of registered votes for the 2020 general election, Ruedrich concluded that "at minimum, this demonstrated [House District] 27 Precinct 915 undervote is 57 votes."  If these 57 "missed" votes were allocated to the candidates in

---

[67]     Pruitt's complaint alleged that "[t]here were several errors in the conduct of the election sufficient to change the outcome of the election," claiming that all the alleged malconduct together was sufficient to change the outcome of the election.  This is a justiciable claim.  *See Hammond*, 588 P.2d at 259 ("The total number of votes affected by [incidents of malconduct] must . . . be considered in ascertaining whether they are sufficient to change the result of the election.").  On appeal, however, Pruitt has abandoned all claims of error except the notice claim under AS 15.10.090, so to prevail he must show that the effect of this alleged malconduct alone is sufficient to change the election outcome.

[68]     *Nageak*, 426 P.3d at 947 n.73.

[69]     AS 15.20.540.

proportion to the existing vote totals for that precinct, Pruitt would have received 17 more "missed" votes than Snyder, winning the election by 6 votes.[70]

The superior court rejected Ruedrich's analysis, pointing to flaws in his underlying assumptions. The court found that Ruedrich relied on the flawed assumption that turnout in 27-910, 27-915, and 27-920 should be the same, when the court found instead that turnout "is not always the same historically in the three precincts." And it found that Ruedrich's "two primary assumptions (first, that the three precincts should have precisely equal [e]lection ]d]ay turnout and second, that any difference in turnout was caused by the change of the polling place) are also his conclusions." The court credited Ruedrich's testimony that "moving polling places generally lowers turnout." But it also found that it could not "determine by what increment additional feasible notice under AS 15.10.090 . . . would have mitigated any reduction in turnout caused by the polling place change." It therefore concluded that the evidence did not show that "at least 11 registered voters were prevented from voting because they did not receive actual notice of the polling place change." On appeal, Pruitt does not address, let alone rebut, these findings.

---

[70]     Our decision in *Hammond v. Hickel* prescribed the method used to determine whether votes affected by malconduct are sufficient to change the result of an election: "[I]f a specified number of votes should have been counted but are no longer available for counting, they should be added to the vote totals of each candidate in proportion to the votes received by the candidate in the precinct or district in which the votes would otherwise be counted." *Hammond*, 588 P.2d at 260. Here, Pruitt received 204 election-day votes in 27-915, Snyder received 106 votes, and 311 votes were cast in total. Assuming that Ruedrich is correct and the undervote in 27-915 was 57 votes, Pruitt would receive 65.59% of those votes, or about 37.39 votes, and Snyder would receive 34.08% of those votes, or about 19.43 votes. Pruitt would therefore receive a net gain of 17.96 votes in 27-915; subtracting Snyder's previous lead of 11 votes would result in victory for Pruitt by a margin of 6 votes.

The superior court's factual findings about Ruedrich's testimony are not clearly erroneous. The superior court heard both Ruedrich's testimony and Townsend's testimony critiquing Ruedrich's analysis. "It is the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence."[71] The court's rejection of Ruedrich's conclusions rested on three gaps in Ruedrich's analysis: he did not consider that turnout in 27-915 has not historically been the same as in neighboring precincts; he did not explore and rule out alternative explanations for the difference in turnout between precincts; and he did not distinguish between the effects of the polling place move itself and the effects of the failure to provide the forms of notice required by AS 15.10.090. As noted above, Pruitt has not even addressed these issues on appeal, and our review of the testimony does not convince us that the superior court was clearly wrong in finding that these omissions fatally undermined Ruedrich's opinion.

In addition to Ruedrich's testimony, Pruitt presented one witness, Mary Jo Cunniff, who claimed that she was prevented from voting by lack of notice of the polling place change. The superior court found otherwise. It noted that by Cunniff's own account, she "lost 15 minutes by going to Wayland Baptist University" before learning of the change and going to Begich, where she chose not to vote because of the line. The court concluded that if voters received notice of the polling place change and chose not to go to Begich, or if they went to Begich but chose not to vote, "this court cannot count those 'undervotes' in determining whether any malconduct was sufficient to change the results of the election absent evidence that voters were actually prevented from voting as a result of the Division's alleged malconduct."

The superior court's finding that Cunniff was not prevented from voting is not clearly erroneous. Pruitt argues that "due to the lack of notice and coupled with

---

[71]     *Knutson v. Knutson*, 973 P.2d 596, 599-600 (Alaska 1999).

[Cunniff's] obligation for the day," Cunniff "was not able to go back to Begich Middle School and cast her vote." As the superior court concluded, it is not at all clear that the 15 minutes Cunniff lost by going to Wayland first was the difference between voting and not voting. Pruitt offered no evidence showing that if Cunniff had arrived at Begich at 8:30 a.m. rather than 8:45 a.m., the line would have been short enough to allow Cunniff to vote and then make her 10:00 a.m. appointment. Nor did Pruitt prove the line at 8:45 a.m. was too long for Cunniff to vote and make her appointment.[72] He offered only Cunniff's summary assessment that she'd "never make it." And even if Cunniff were prevented from voting, Pruitt would still need to show that at least ten other 27-915 residents were prevented from voting in order to show that the lack of notice changed the result of the election.

Pruitt quibbles with the superior court's findings about the timelines Cunniff testified to, arguing that the court "failed to account for the fact" that the times Cunniff gave "were approximate." He seems to imply that the lack of notice could have cost Cunniff much more than 15 minutes on election day. But the superior court's factual finding that Cunniff lost 15 minutes is not clearly erroneous. The court interpreted the time ranges given by Cunniff as generously to Pruitt as possible. In the absence of other testimony, the superior court did not clearly err by using the time ranges Cunniff herself provided.

Instead of challenging the superior court's findings, Pruitt argues that because "[i]t is impossible to say with absolute certainty what the true impact of the Division's malconduct was . . . the only remedy here is a new election." But neither statute nor precedent permits us to overturn election results based on speculation.

---

[72]     There is no reason that the Division's lack of notice should have contributed to the line length itself; if Pruitt's theory is correct, the lack of notice should have *shortened* the line by depressing voter turnout.

Rather, it is the challenger's burden to show that any malconduct was sufficient to change the result of the election — not the Division's burden to show that malconduct had no effect on the election.[73] Adopting the low threshold Pruitt describes would open the door to meritless lawsuits and undermine the integrity of our electoral process. "Because the public has an important interest in the stability and finality of election results . . . we have held that 'every reasonable presumption will be indulged in favor of the validity of an election.' "[74] Pruitt's speculation is not enough to support his election challenge.[75]

## V. CONCLUSION

We REVERSE the superior court's dismissal of Lance Pruitt's complaint for failure to state a claim for an election contest, but AFFIRM the superior court's ruling that Pruitt did not meet his burden to sustain an election contest. We therefore AFFIRM the judgment of the superior court pronouncing Elizabeth Synder the candidate elected in the 2020 election for House District 27.

---

[73] *See Nageak v. Mallott*, 426 P.3d 930, 950 (Alaska 2018) (explaining that "[i]t was [the plaintiff's] burden to show that the malconduct . . . was sufficient to change the result of the election").

[74] *Dansereau v. Ulmer*, 903 P.2d 555, 559 (Alaska 1995) (quoting *Turkington v. City of Kachemak*, 380 P.2d 593, 595 (Alaska 1963)).

[75] The Division has invited us to rule on the question of whether an election contest may be premised on a post-election challenge to the residency qualifications of individual voters. Although Pruitt attempted to challenge the qualifications of certain voters as part of his election contest, he has not appealed the superior court's dismissal of that claim. Because this issue has not been properly presented to this court, we decline the Division's invitation to rule on it.